**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In re:**

**PHOENIX PRESS, LLC**

Case No. 26-47856
Chapter 11
Hon. Thomas J. Tucker

Debtor.
_______________________________________/

**COVER SHEET FOR DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION SECURED FINANCING; (II) GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS 364(c)(1) AND 364(d)(1); (III) AUTHORIZING DEBTOR TO USE CASH COLLATERAL; (IV) AUTHORIZING ADEQUATE PROTECTION TO THE PREPETITION LENDERS; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING**

The Debtor has filed a motion to authorize post-petition financing and use of cash collateral, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the Debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _X__ Yes<br><br>____ No | Pages 32-33, ¶ 22 |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _X___ Yes<br><br>_____ No | Pages 6-12, 29-30, ¶ 4, 19 |
| (5) Provisions that prime any lien without that lienholder's consent. | ___X__ Yes<br><br>______ No | Page 17, ¶ 11 |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br><br>__X___ No | Page ___, ¶ ___ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | _____ Yes<br><br>__X__ No | Pages 23-25, ¶ 16 |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br><br>___X__ No | Page ___, ¶ ___ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br>__X__ No | Page 27, ¶ 18 |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _X__ Yes<br>____ No | Page 27, ¶ 18 |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _X__ Yes<br>____ No | Page 27, ¶ 18 |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | _X__ Yes<br>____ No | Pages 19, 23 ¶ 12, 15 |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | __X__ Yes<br>____ No | Page 25, ¶ 17 |
| (16) Provisions that purport to bind a subsequent trustee. | __X__ Yes<br>____ No | Page 34, ¶ 23 |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | _X__ Yes<br>____ No | Page 14, 19-20<br>¶ 8, 13 |

Respectfully submitted,

HEILMAN LAW PLLC

Dated: November 4, 2025

By: /s/ Ryan D. Heilman
Ryan D. Heilman (P63952)
Attorneys for Debtor
40900 Woodward Ave., Suite 100
Bloomfield, MI 48304
(248) 835-4745
ryan@heilmanlaw.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In re:**

**PHOENIX PRESS, LLC**

Case No. 26-47856
Chapter 11
Hon. Thomas J. Tucker

Debtor.
_______________________________________/

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION SECURED FINANCING; (II) GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS 364(c)(1) AND 364(d)(1); (III) AUTHORIZING DEBTOR TO USE CASH COLLATERAL; (IV) AUTHORIZING ADEQUATE PROTECTION TO THE PREPETITION LENDERS; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING**

Phoenix Press, LLC ("Debtor") through counsel, Heilman Law PLLC, for its Motion for Entry of Interim and Final Orders Authorizing Debtor to Use Cash Collateral and Authorizing Adequate Protection (I) Authorizing Post-Petition Secured Financing; (II) Granting Priority Administrative Expense and Priming Liens on Debtor's Property Pursuant to Sections 364(c)(1) And 364(d)(1); (III) Authorizing Debtor to Use Cash Collateral; (IV) Authorizing Adequate Protection to the Prepetition Lenders; (V) Modifying the Automatic Stay; and (Vi) Scheduling A Final Hearing ("Motion"), states:

## INTRODUCTION AND REQUEST FOR AN EXPEDITED HEARING

1. By this Motion, Debtor seeks entry of interim and final orders under 11 U.S.C. § 364 authorizing Debtor to obtain post-petition secured financing ("DIP Loan"). To secure the DIP Loan, Debtor requests Court authorization to

grant the proposed Lender (defined below) priming liens on all Debtor's assets with priority over all other liens, security interests and encumbrances, excepting all liens and security interests in favor of (a) InterNex Capital Funding, LLC (the "Senior Lender"), (b) purchase money security interests, and (c) other liens in favor of taxing authorities and utilities, if any. Debtor seeks to further grant the proposed Lender a superpriority administrative expense claim with priority over all other administrative expenses. As discussed further, below, the DIP Loan will be provided by PI DIP, LLC ("DIP Lender"), which is a company owned and controlled by insiders of Debtor.

2. In addition to obtaining the DIP Loan, Debtor seeks authorization to use cash collateral on an interim and final basis.

3. Debtor offers the adequate protection set forth below, which Debtor submits is sufficient to protect the interests of all pre-petition lenders and other secured creditors.

4. Debtor requires the proceeds of the DIP Loan and the use of cash collateral on an immediate basis to permit Debtor to (a) obtain critically necessary maintenance and materials necessary to operate Debtor's equipment; (b) maintain its business relationships with vendors, suppliers and customers; and (c) make payroll, capital expenditures and satisfy other working capital and operational needs; and (d) otherwise continue the orderly operation of its business.

5. As discussed in Debtor's Declaration in Support of First Day Motions, Debtor pays its hourly employees on a bi-weekly basis, with the next payroll due to be funded to a third-party servicer by the end of the day on Thursday, July 16 and paid to employees on Friday, July 17. *See* Declaration, attached as Exhibit 5.

6. Debtor further requires immediate use of the DIP Loan proceeds to pay critical maintenance costs. Debtor's Canon equipment at its Troy facility is largely inoperable. Debtor requires use of this equipment as soon as possible in order to continue producing for its customers and will lose customers if the equipment is not made operable in short order. Canon Solutions America, Inc., Debtor's sole-provider maintenance provider for this equipment, has refused to resume maintenance and supply for this equipment unless Debtor is able to make payments in advance.

7. **Accordingly, Debtor requests that the Court schedule an interim hearing no later than <u>Thursday, July 16, 2026</u>**. Failure to timely obtain authorization to enter in the DIP Loan will result in immediate and irreparable harm.

8. To provide full and adequate notice, Debtor intends to serve all first day motions and exhibits, including this motion, as well as any Order entered by the Court scheduling a hearing on first day motions, by email and overnight mail <u>for morning delivery</u> on all parties required to receive

service (Debtor currently has email addresses for 18 of the top 20 unsecured creditors).

## JURISDICTION

9. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

10. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

11. Venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

12. On July 14, 2026 ("Petition Date"), Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code.

13. Debtor continues to operate its business as debtor-in-possession as permitted under section §§ 1107 and 1108 of the Bankruptcy Code.[1]

### A. Debtor's Operations and Budget.

14. Debtor operates under the trade name Phoenix Innovate and is a full-service, national marketing solutions provider with proprietary technological tools and direct and digital marketing solutions. Debtor's services include digital printing, graphics and displays, direct mail

---

[1] Unless otherwise specified, statutory references in this Motion are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

programs, digital marketing, research and data analysis, application development and custom software integrations, marketing strategy, production execution, warehousing and fulfillment, and project management.

15. A proposed cash flow forecast is attached as Exhibit 6.A ("Budget"). This is the same Budget that was approved in the Final Cash Collateral Order. Debtor's Budget provides for payment of necessary and critical expenses, such as payroll, maintenance costs, equipment leases, facility costs, insurance premiums, and the costs of the Chapter 11 bankruptcy case.

16. The Budget also shows projected cash receipts and accounts receivable generated in Debtor's business operations. Over the initial 13-week period, Debtor projects to have a positive cash flow balance of approximately $66,000 after including all costs and expenses of operations.

**B. Prepetition Secured Debt and Debtor's Cash Collateral.**

17. Debtor has two pre-petition creditors with a lien on substantially all Debtor's assets:

18. InterNex Capital, LLC ("Senior Lender") holds a first-position security interest in substantially all Debtor's assets. Debtor owes Senior Lender approximately $2,011,228, plus certain fees, interest, costs and expenses (the "Senior Lender Prepetition Obligations"). The "Senior Lender Prepetition Transaction Documents" mean any and all documents relating to the Senior

Lender Prepetition Credit Agreement as defined herein including but not limited to:

i. The *Loan And Security Agreement* dated May 15, 2026 (as so amended and as it may be further amended or supplemented from time to time, the "Senior Lender Prepetition Credit Agreement").

ii. To secure the Senior Lender Prepetition Obligations, the Senior Lender Prepetition Credit Agreement grants to the Senior Lender a security interest in substantially all of the assets of the Debtor (the "Senior Lender Prepetition Collateral"). The Senior Lender's security interest in the Senior Lender Prepetition Collateral was and is duly perfected by the filings of UCC-1s for the Debtor with the Secretary of State for the States of Michigan.

iii. Kirk Vercnocke and Geoffrey Vercnocke also guaranteed Debtor's payment of the Senior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

iv. Phoenix Press Holdco, Inc. also guaranteed Debtor's payment of the Senior Lender Prepetition Obligations pursuant to a certain *Secured Corporate Guaranty*.

19. Internex Capital, LLC (the "Senior Lender Servicer") (on its behalf and on behalf of the Senior Lender) perfected the Senior Lender's security interests and other liens (the "Senior Lender Prepetition Liens") in and on the Senior Lender Prepetition Collateral.

20. Bender Equity LLC (the "Junior Lender")[2] holds a second-position security interest in substantially all Debtor's assets. Debtor owes Junior Lender approximately $2,011,228, plus certain fees, interest, costs and expenses (the "Junior Lender Prepetition Obligations"). The "Junior Lender Prepetition Transaction Documents"[3] mean any and all documents relating to the Junior Lender Prepetition Credit Agreement as defined herein including but not limited to:

v. The *Loan And Security Agreement* dated July 1, 2024 (as so amended and as it may be further amended or supplemented from time to time, the "Junior Lender Prepetition Credit Agreement").

vi. The two Promisory Notes dated July 1, 2024 (the "Junior Lender Prepetition 2024 Promisory Notes").

vii. The *Promisory Note* dated May 6, 2026 (the "Junior Lender Prepetition 2026 Promisory Notes").

viii. The *Warrant* dated July 1, 2024 whereby the Junior Lender was entitied to purchase from the Debtor one percent (1%) of the total issued and outstanding shares of the Debtor's common stock at a price per share of $0.01 (the "Junior Lender Warrant").

ix. The Subordination Agreement dated July 1, 2024 whereby TLC, the Lukens Company, Pinnacle List Company, and PersuassionPartners, Inc. ("Lukens") subordinated its indebtedness to the Junior Lender (the "Lukens Subordination Agreement").

---

[2] And together with the Senior Lender, the "Prepetition Lenders."

[3] And together with the Senior Lender Prepetition Transaction Documents, the "Prepetition Transaction Documents."

x. To secure the Junior Lender Prepetition Obligations, the Junior Lender Prepetition Credit Agreement grants to the Junior Lender a security interest in substantially all of the assets of the Debtor (the "Junior Lender Prepetition Collateral"). The Junior Lender's security interest in the Junior Lender Prepetition Collateral was and is duly perfected by the filings of UCC-1s for the Debtor with the Secretary of State for the States of Michigan.

xi. Kirk Vercnocke and Geoffrey Vercnocke also guaranteed Debtor's payment of the Junior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

xii. COMSPEC International, Inc. also guaranteed Debtor's payment of the Junior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

21. The Junior Lender perfected its security interests and other liens (the "Senior Lender Prepetition Liens") in and on the Senior Lender Prepetition Collateral.

22. Based on Debtor's records and search of Michigan's Uniform Commercial Code (UCC) database, Debtor believes that no other person or entity holds an interest in Debtor's cash collateral. North Mill Equipment Finance, LLC has a security interest in certain equipment belonging to Debtor and Debtor has leased with equipment with Canon Financial Services, Inc. and other equipment lessors, but Debtor believes none of these creditors have an interest in Debtor's cash collateral. Debtor will provide notice of this Motion to each of these creditors.

23. For purposes of complying with Local Rule 4001-2(a), Debtor estimates the value of its assets at approximately $6.625 million on a going-concern basis. Debtor believes that Senior Lender is over-secured and that Junior Lender is undersecured but that the value of Junior Lender's interest in Debtor's assets approximates $4,719,736.

## PROPOSED DIP LOAN TERMS

24. The salient terms of the DIP Loan are listed in the term sheet attached as Exhibit 6.a and summarized as follows:

| | |
|---|---|
| DIP Lender: | PI DIP, LLC ("**DIP Lender**")<br>DIP Lender is controlled by Geoff Vercnocke, one of Debtor's owners, and is funded by Mr. Vercnocke and related family members. |
| Loan Amount:<br>Interim Loan Amount: | $810,000<br>$500,000 |
| Structure: | Second-position (behind the Senior Lender) priming DIP Loan. |
| Interest Rate and Fees | Interest at 11.50%;<br>5.0% commitment fee earned upon entry of the Interim and Final DIP Orders;<br>$1,000 Administration Fee payable monthly;<br>Plus all costs and expenses, including all legal fees. |
| Application of Proceeds: | Debtor is only permitted to make payments consistent with a Budget, including payments of interest and fees to the DIP Lender and adequate protection payments to Senior Lender. |

| | |
|---|---|
| Maturity Date: | January 31, 2027. |
| Priority and Liens: | Superpriority administrative claim status pursuant to 11 U.S.C. § 364(c)(1). Priming liens on all Debtor's assets pursuant to 11 U.S.C. § 364(d) with priority over all liens, mortgages and security interests except the liens in favor of Senior Lender, taxes and utilities. |
| Professional Fees | Fees and expenses for Lender's and Debtor's professionals to be out of proceeds of Lender's collateral. |
| Events of Default: | The DIP Loan contains usual and customary events of default. |
| Remedies on Event of Default: | In addition to other customary remedies, upon the occurrence and during the continuance of an Event of Default and following the giving of 5 business days' notice to counsel for the Debtors and the United States Trustee, the Lender shall have relief from the automatic stay and may foreclose on all or any portion of the Collateral and apply the proceeds thereof to the obligations, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law after payment to the Senior Lender. |

25. The DIP Loan is to be secured by a priming lien on all Debtor's assets with priority over all pre-existing and future liens, security interests and mortgages excepting only liens in favor of the Senior Lender ("Senior Lender Liens"), taxing authorities ("Tax Liens"), and utility providers ("Utility Liens"). Debtor is not aware of any current Tax Liens or Utility Liens against Debtor's assets.

26. A copy of the proposed credit agreement is attached as Exhibit 6.B and a copy of the proposed promissory note is attached as Exhibit 6.C. The DIP Lender may (but is not required to) demand that Debtor also enter into a security agreement, financing statement or similar document memorializing or securing the DIP Loan, so long as the terms do not conflict with this Order or the Loan Agreement (collectively, "Loan Documents"). Notwithstanding anything to the contrary in any of the Loan Documents, Senior Lender shall retain its first-position secured status on all Debtor's assets and, in the event of any Termination Event (as defined below), Senior Lender shall be paid before payments to the DIP Lender.

27. The DIP Loan is also to be secured with a superpriority administrative expense claim with priority over all other administrative expenses as permitted under 11 U.S.C. § 364(c)(1), except that this administrative expense claim will not take priority over any claim in favor of Senior Lender.

## FACTUAL SUPPORT FOR RELIEF

### A. Use of Post-Petition Financing

28. Debtor requires post-petition financing to continue the conduct of its business and pay the costs, fees and expenses associated with this Bankruptcy Case. *See* Declaration (Exhibit 5) and Debtor's cash flow projections (Exhibit 6.A). Critically, Debtor requires immediate use of cash collateral and the DIP Loan proceeds on an interim basis to make required payroll payments and to pay necessary maintenance and supply costs to resume operations at its Troy facility.

**B. Request for Immediate and Interim Relief**

29. As set forth above, to avoid immediate and irreparable harm, Debtor requires the use of cash collateral by close of business on Thursday July 16, 2026 to ensure timely payment of payroll and payments for equipment maintenance and supply. Debtor will need to make other post-petition payments on or shortly after July 16, 2026 as set forth in the attached Budget.

30. Debtor requests interim relief in the form of an order permitting Debtor to pay the necessary expenses for Debtor to continue its operations, place insurance and begin making necessary health and safety repairs over the next thirty days until a final order can be entered.

31. As set forth in Debtor's cash flow forecast and the attached Declaration, Debtor projects necessary disbursements during the first four weeks of this case in the approximate amount of $2,374,380. Debtor requires approximately $500,000 in financing to make these disbursements, with the remaining approximately $1,874,830 to be funded through the use of cash collateral. Debtor requests that the Court authorize Debtor to obtain financing and use cash collateral on an interim basis consistent with the attached Budget with a ten percent variance in projected operating costs.

**D. Adequate Protection**

32. Debtor believes that the use of the DIP Loan make payroll, repair and operate equipment and continue Debtor's business operations will benefit all

creditors. Accordingly, Debtor believes that the proposed use of the DIP Loan itself constitutes adequate protection.

33. Debtor believes that Senior Lender is fully secured. Debtor proposes making payments to Senior Lender equal to the non-default contractual interest required under the Senior Lender Prepetition Transaction Documents (the "Adequate Protection Payments"). All such adequate protection payments must be made on or before the first business day of each month.

34. The Senior Lender and Junior Lender are granted replacement liens in all Debtor's post-petition acquired assets to the same extent, and with the same validity and priority, as the Senior Lender's and Junior Lender's prepetition liens and security interests (the "Adequate Protection Liens"). For the avoidance of doubt, the Adequate Protection Liens shall not attach to any avoidance actions (or their proceeds) arising under Chapter 5 of the Bankruptcy Code.

35. The Prepetition Lenders and their advisors shall be given reasonable access for purposes of monitoring the business of the Debtor and the value of the Prepetition Collateral; and the Debtor shall provide the Prepetition Lenders with any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Lender.

36. Debtor will also (i) keep its property fully insured, and (ii) otherwise timely perform all obligations of a debtor-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the orders of this Court.

## LEGAL BASIS FOR RELIEF REQUESTED

37. Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

38. If a debtor requires post-petition funding and is unable to obtain unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in 11 U.S.C. § 503(b) or § 507(b). See 11 U.S.C. § 364(c)(1).

39. If the Debtor is unable to otherwise obtain post-petition credit and there is adequate protection to the interests of lien holders, the Debtor may obtain credit by granting a senior lien on property of the estate. 11 U.S.C. § 364(d).

40. Debtor has sought post-petition financing. No other prospective lender has agreed to make post-petition loans available to Debtor on terms as favorable as the terms provided by the DIP Lender.

41. Debtor has had extensive pre-petition discussions with Senior Lender regarding a debtor-in-possession loan and Debtor intends to continue those discussions post-petition. However, the loan offered by the Senior Lender is substantially more costly and would require payment of the Senior Lender

Prepetition Obligations and would not provide the liquidity Debtor currently requires.

42. Accordingly, Debtor is not able to obtain post-petition financing on any terms more favorable than those offered by the DIP Lender.

43. As stated above, the proceeds of the DIP Loan will be used to pay payroll, pay for critical maintenance and supplies, and continue Debtor's business in accordance with the Budget so that Debtor can commence a sale process for the benefit of all creditors. Debtor believes the continuation of Debtor's business is, itself, adequate protection. Debtor believes that if the DIP Loan is not approved on an emergency basis, and Debtor is not authorized to use cash collateral, Debtor's business would not be able to continue operations and Debtor would liquidate with substantial losses to all Debtor's creditors.

44. Accordingly, Debtor submits that the Adequate Protection Liens and the Adequate Protection Payments are sufficient to protect the interests of the Senior Lender and Junior Lender. However, Debtor further proposes that the Senior Lender, Junior Lender and any other entity may request additional or different adequate protection by motion at any time.

45. The Debtor negotiated the DIP Loan with the DIP Lender pursuant to its business judgment. Provided that this judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., *Brav v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789

F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain business); *In re Ames Department Stores*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

46. Accordingly, Debtor submits that approval of the DIP Loan is appropriate under the circumstances.

## SCHEDULING A FINAL HEARING

47. Debtor further respectfully requests that the Court schedule a final hearing on the Motion as contemplated by LBR 4001-2(b)(3).

## NOTICE

48. Debtor intends to serve this Motion with all exhibits, and the hearing notice with respect thereto, on July 15, 2026 by email and by delivery to by overnight delivery service (**with morning delivery**) to the following parties in interest: (i) the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee"); (ii) those parties listed on the List of Creditors Holding Largest Twenty Unsecured Claims Against the Debtor, as identified in the Debtor's chapter 11 petition; (iii) counsel to the DIP Lender; (v) the Internal Revenue Service; and (vi) all known secured creditors (collectively, the "Interim Notice Parties"). Given the nature of the relief sought in the Motion, such notice

constitutes sufficient and adequate notice of this Interim Order pursuant to Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9014 and section 102(1) of the Bankruptcy Code, as required by sections 363(b) and 364(d) of the Bankruptcy Code, and no further notice of the Motion or this Interim Order is necessary or required.

**WHEREFORE**, Debtor requests that the Court enter an order (i) authorizing Debtor to entry of interim and final orders under 11 U.S.C. § 364 authorizing Debtor to use cash collateral and obtain post-petition secured financing, (ii) authorizing Debtor to grant the proposed DIP Lender priming liens on all Debtor's assets with priority over all other liens, security interests and encumbrances other than liens in favor of Senior Lender, taxing authorities and utilities, (iii) grant the proposed Lender a superpriority administrative expense claim with priority over all other administrative expenses other than claims of Senior Lender, (iv) authorizing interim borrowing under the DIP Loan consistent with the Budget, but not to exceed $500,000, and interim use of cash collateral consistent with the Budget, but not to exceed $1,874,830; and (v) scheduling a final hearing. A proposed order scheduling a hearing on the Motion is attached as Exhibit 1.

Respectfully submitted,

HEILMAN LAW PLLC

Dated: July 15, 2026 By: /s/ Ryan D. Heilman

Ryan D. Heilman (P63952)
Attorneys for Debtor
40900 Woodward Ave., Suite 100
Bloomfield, MI 48304
(248) 835-4745
ryan@heilmanlaw.com

## EXHIBIT INDEX

| | |
|---|---|
| | Post-petition Financing Cover Sheet |
| EXHIBIT 1 | Proposed Order granting the Motion |
| EXHIBIT 2 | Notice of the Motion – N/A – copies of the Motion with all attachments, and a notice of hearing (if any) will be served as required under LBR 4001-2(d) upon the earlier of (i) entry of an order scheduling a hearing on the motion on an expedited basis (**which will be served for deliver before noon on July 16**), or (ii) 24 hours after the filing of the Motion as required under LBR 9013-1(b). A certificate of service will be filed. Service will also be made by email to all parties for which Debtor has a valid email address. |
| EXHIBIT 3 | N/A |
| EXHIBIT 4 | Certificate of Service – to be filed as a separate docket entry. |
| EXHIBIT 5 | Declaration of Kirk Vercnocke |
| EXHIBIT 6.A | Budget |
| Exhibit 6.B | Loan Agreement |
| Exhibit 6.C | Promissory Note |

# EXHIBIT 1

*Proposed Order*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In re:**

**PHOENIX PRESS, LLC**

Case No. 26-47856
Chapter 11
Hon. Thomas J. Tucker

Debtor.
_______________________________________/

**INTERIM ORDER**
**(I) AUTHORIZING POST-PETITION SECURED FINANCING;**
**(II) GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS 364(c)(1) AND 364(d)(1);**
**(III) AUTHORIZING DEBTOR TO USE CASH COLLATERAL;**
**(IV) AUTHORIZING ADEQUATE PROTECTION TO THE PREPETITION LENDERS;**
**(V) MODIFYING THE AUTOMATIC STAY; AND**
**(VI) SCHEDULING A FINAL HEARING**

THIS MATTER having come before the Court upon the motion (the "DIP Motion")[1] by PHOENIX PRESS, LLC ("Phoenix") a Michigan limited liability company Debtor and Debtor in possession (the "Borrower" or the "Debtor") in the above-captioned chapter 11 cases (collectively the "Cases"), and Rule 4001-2 of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan seeking entry of an Interim Order and the Final Order (as defined below):

(a) Authorizing the Debtor to obtain post-petition financing pursuant to sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") by entering into a second-position (second to InterNex Capital Funding, LLC (the "Senior Lender")) secured, debtor in possession creditor facility on a super-priority to be executed after the entry of this Interim Order (as may be amended, supplemented or otherwise

[1] All capitalized terms not defined in this Order shall have the meanings set forth in the DIP Motion.

modified from time to time, the "DIP Facility") providing for financing in an aggregate maximum principal amount of up to $500,000 on an interim basis (the "Interim Amount"), and up to $810,000 (inclusive of the Interim Amount) on a final basis in the form of a revolving loan for payments of (i) interest, fees and costs as required by the DIP Loan Documents (defined below), and (ii) operating costs and other expenses in accordance with the Budget (defined below) (the "DIP Loan");;

(b) Authorizing the Debtor to execute and enter into the DIP Facility, among the Debtor and PI DIP, LLC in its individual capacity as the post-petition debtor-in-possession lender (the "DIP Lender") and all other documents, agreements or instruments in connection therewith or related thereto, including the DIP Facility, this Interim Order, any Final Order (defined below) and all other definitive agreements, documents, notes or instruments related to the DIP Loan, the "DIP Loan Documents") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(c) Granting a second priority (second to Senior Lender) priming lien on all existing and after-acquired personal and real property other than (i) the fees of the clerk of the Bankruptcy Court and fees of the United States Trustee, (ii) prior to a carve-out trigger notice, fees and expenses of professionals retained by the Debtor or any committee, (iii) after an Event of Default (defined below) and issuance of carve-out trigger notice, fees and expenses of professionals retained by the Debtor, any chapter 11 trustee appointed in the Bankruptcy Case and the committee up to a specified limited amount (but not any Transaction Fee (defined below) of any investment banker); and (iv) Permitted Liens (defined below) for the benefit of the DIP Lender in accordance with

the DIP Loan Documents, this Interim Order and the Final Order (as defined below) to secure any and all of the Post-petition Obligations (as defined below);

(d) Granting adequate protection to Senior Lender and Bender Equity LLC (the "Junior Lender," and together with the Senior Lender, the "Prepetition Lenders") to include: (i) additional and replacement liens on existing and post-petition collateral and other existing and future property of the estate, in each case, except for Senior Lender, junior in priority to DIP Liens; (ii) and super-priority claims junior to DIP super-priority claims;

(e) Authorizing for the Debtor to use cash collateral (as such term is defined in the Bankruptcy Code) in which the Prepetition Lenders have an interest, and granting adequate protection to the Prepetition Lenders with respect to, *inter alia*, such use of their cash collateral and all use and diminution in the value of the pre-petition collateral and Cash Collateral;

(f) Pending a final hearing on the Motion (the "Final Hearing"), obtaining the DIP Loan under the DIP Facility in the principal amount not to exceed $500,000 until the Final Order is entered;

(g) Modifying the automatic stay, under section 362 of the Bankruptcy Code, to permit the DIP Lender to accelerate the repayment of amounts due and the termination of all commitment under the DIP Facility upon a Termination Event (as defined below);

(h) Waiving the Debtor's right to seek surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, effective upon entry of the Final Order; and

(i) Scheduling the Final Hearing and approving notice with respect thereto in accordance with Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Court having considered the Motion, the exhibits attached thereto, including the DIP Loan Documents; and a hearing to consider approval of the interim amount having been held and concluded on [____] (the "Interim Hearing"); and all objections to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; the Court having reviewed the declarations submitted with the Motion; and based on the Motion and all of the papers, including the declaration, filed with the Court and all of the proceedings held before the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS, DETERMINES, ORDERS AND ADJUDGES:**[2]

1. ***Bankruptcy Petition***. On July 14, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Debtor is continuing in the management and possession of its business and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no statutory committee (a "Committee") has yet been appointed in the Debtor's chapter 11 case (the "Case").

2. ***Jurisdiction***. Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2). This Court has jurisdiction over this proceeding and the parties

[2] To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Rule 7052.

and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. ***Need for Financing.***

i. An immediate and critical need exists for the Debtor to obtain funds and use Prepetition Collateral (as defined below) and Cash Collateral in order, among other things to: (a) obtain critically necessary maintenance and materials necessary to operate Debtor's equipment; (b) maintain its business relationships with vendors, suppliers and customers; and (c) make payroll, capital expenditures and satisfy other working capital and operational needs; and (d) otherwise continue the orderly operation of its business. The access of the Debtor to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor;

ii. The Debtor is unable to obtain unsecured credit allowable only as an unsecured, administrative expense claim under section 503(b)(1) of the Bankruptcy Code. The Debtor also is unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) or 364(c)(3) without the Debtor's granting to the DIP Lender liens on the assets of the Debtor pursuant to sections 364(c)(2) and 364(c)(3) and 364(d) of the Bankruptcy Code and super-priority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code for its administrative expense priority claim under section 503(b) of the Bankruptcy Code, in each case as provided by this Interim Order and the DIP Loan Documents;

iii. The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

iv. The ability of the Debtor to continue its business and preserve its going concern value under chapter 11 of the Bankruptcy Code depends upon the Debtor obtaining such financing and using such Cash Collateral.

v. Without the ability to obtain borrowings under the DIP Facility prior to entry of a Final Order, the Debtor faces imminent interruption of its business operations.

vi. It is in the best interests of the Debtor's estate that it be allowed to finance its operations and use Cash Collateral under the terms and conditions set forth herein and in the DIP Loan Documents. The relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtor's estate, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order.

vii. Based upon the record before the Court, the use of Cash Collateral and the terms of the DIP Loan Documents have been negotiated at arm's length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its estate and creditors. The DIP Lender is extending financing to the Debtor in good faith and is entitled to the protections and benefits of the provisions of section 364(e) of the Bankruptcy Code.

4. ***Debtor's Stipulations.*** The Debtor has stipulated, acknowledged, admitted, represented, and confirmed the following as of the Petition Date (the "Debtor's Stipulations"):

i. ***Senior Lender***

a. ***Senior Lender Prepetition Transaction Documents.*** The Senior Lender made loans and other financial accommodations to the Debtor that were guaranteed by Kirk Vercnocke, Geoffrey Vercnocke, and Phoenix Press Holdco, Inc. (the "Guarantors"). The

Senior Lender has a pre-petition validly perfected first-priority secured claim against the Debtor under the Senior Lender Prepetition Transaction Documents on all of the Debtor's personal property in an amount owing, as of July 14, 2026, as follows: $2,011,228, plus certain fees, interest, costs and expenses (the "Senior Lender Prepetition Obligations"). The "Senior Lender Prepetition Transaction Documents" mean any and all documents relating to the Senior Lender Prepetition Credit Agreement as defined herein including but not limited to:

i. The *Loan And Security Agreement* dated May 15, 2026 (as so amended and as it may be further amended or supplemented from time to time, the "Senior Lender Prepetition Credit Agreement").

ii. To secure the Senior Lender Prepetition Obligations, the Senior Lender Prepetition Credit Agreement grants to the Senior Lender a security interest in substantially all of the assets of the Debtor (the "Senior Lender Prepetition Collateral"). The Senior Lender's security interest in the Senior Lender Prepetition Collateral was and is duly perfected by the filings of UCC-1s for the Debtor with the Secretary of State for the States of Michigan.

iii. Kirk Vercnocke and Geoffrey Vercnocke also guaranteed Debtor's payment of the Senior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

iv. Phoenix Press Holdco, Inc. also guaranteed Debtor's payment of the Senior Lender Prepetition Obligations pursuant to a certain *Secured Corporate Guaranty*.

b. ***Senior Lender Prepetition Collateral***. Internex Capital, LLC (the "Senior Lender Servicer") (on its behalf and on behalf of the Senior Lender) perfected the Senior Lender's security interests and other

liens (the "Senior Lender Prepetition Liens") in and on the Senior Lender Prepetition Collateral.

c. ***Senior Lender Prepetition Transaction Documents.*** Each Senior Lender Prepetition Transaction Document is a valid and binding agreement and the Debtor is obligated, as provided thereunder.

d. ***Senior Lender Prepetition Obligations.*** The Senior Lender Prepetition Obligations constitute legal, valid and binding obligations of the Debtor and the Guarantors, as applicable, enforceable in accordance with their terms; the Debtor has no objection, offset, defense or counterclaim of any kind or nature to the Senior Lender Prepetition Obligations; and the Senior Lender Prepetition Obligations, and any amounts previously paid to the Senior Lender or Senior Lender Servicer on account thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

e. ***Senior Lender Prepetition Liens.*** The Senior Lender Prepetition Obligations are secured by the Senior Lender Prepetition Liens and that each and every Senior Lender Prepetition Lien is a valid, binding, perfected, enforceable, first-priority lien and security interest granted to the Senior Lender, which is not subject to avoidance, reduction, disallowance, impairment or subordination by

the Debtor pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

ii. ***Junior Lender***

a. ***Junior Lender Prepetition Transaction Documents.*** The Junior Lender made loans and other financial accommodations to the Debtor that were guaranteed by Kirk Vercnocke, Geoffrey Vercnocke, and COMSPEC International, Inc. (the "Guarantors"). The Junior Lender has a pre-petition validly perfected second-priority secured claim (as subordinated to the Senior Lender's claim pursuant to the Prepetition Subordination Agreement (as defined below)) against the Debtor under the Junior Lender Prepetition Transaction Documents on all of the Debtor's personal property in an amount owing, as of July 14, as follows: approximately $8,978,571, plus certain fees, interest, costs and expenses (the "Junior Lender Prepetition Obligations," and together with the Senior Lender Prepetition Obligation, the "Prepetition Obligations"). The "Junior Lender Prepetition Transaction Documents" (together with the Senior Lender Prepetition Transaction Documents, the "Prepetition Transaction Documents") mean any and all documents relating to the Junior Lender Prepetition Credit Agreement as defined herein including but not limited to:

i. The *Loan And Security Agreement* dated July 1, 2024 (as so amended and as it may be further amended or supplemented

from time to time, the "Junior Lender Prepetition Credit Agreement").

ii. The two Promissory Notes dated July 1, 2024 (the "Junior Lender Prepetition 2024 Promisory Notes").

iii. The *Promisory Note* dated May 6, 2026 (the "Junior Lender Prepetition 2026 Promisory Notes").

iv. The *Warrant* dated July 1, 2024 whereby the Junior Lender was entitied to purchase from the Debtor one percent (1%) of the total issued and outstanding shares of the Debtor's common stock at a price per share of $0.01 (the "Junior Lender Warrant").

v. The Subordination Agreement dated July 1, 2024 whereby TLC, the Lukens Company, Pinnacle List Company, and PersuassionPartners, Inc. ("Lukens") subordinated its indebtedness to the Junior Lender (the "Lukens Subordination Agreement").

vi. To secure the Junior Lender Prepetition Obligations, the Junior Lender Prepetition Credit Agreement grants to the Junior Lender a security interest in substantially all of the assets of the Debtor (the "Junior Lender Prepetition Collateral"). The Junior Lender's security interest in the Junior Lender Prepetition Collateral was and is duly perfected by the filings of UCC-1s for the Debtor with the Secretary of State for the States of Michigan.

vii. Kirk Vercnocke and Geoffrey Vercnocke also guaranteed Debtor's payment of the Junior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

viii. COMSPEC International, Inc. also guaranteed Debtor's payment of the Junior Lender Prepetition Obligations pursuant to a certain *Guaranty*.

b. ***Junior Lender Prepetition Collateral***. The Junior Lender perfected its security interests and other liens (the "Junior Lender Prepetition Liens," and together with the Senior Lender Prepetition Liens, the "Prepetition Liens") in and on the Junior Lender Prepetition

Collateral (together with the Senior Prepetition Collateral, the "Prepetition Collateral").

c. ***Junior Lender Prepetition Transaction Documents.*** Each Junior Lender Prepetition Transaction Document is a valid and binding agreement and the Debtor is obligated, as provided thereunder.

d. ***Junior Lender Prepetition Obligations.*** The Junior Lender Prepetition Obligations constitute legal, valid and binding obligations of the Debtor and the Guarantors, as applicable, enforceable in accordance with their terms; the Debtor has no objection, offset, defense or counterclaim of any kind or nature to the Junior Lender Prepetition Obligations; and the Junior Lender Prepetition Obligations, and any amounts previously paid to the Juinor Lender on account thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

e. ***Junior Lender Prepetition Liens.*** The Junior Lender Prepetition Obligations are secured by the Junior Lender Prepetition Liens and that each and every Junior Lender Prepetition Lien is a valid, binding, perfected, enforceable, second-priority lien and security interest granted to the Junior Lender, which is not subject to avoidance, reduction, disallowance, impairment or subordination by

the Debtor pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

***iii. Senior Lender and Junior Lender Prepetition Subordination Agreement.*** The Senior Lender and the Junior Lender entered into that certain Subordination Agreement dated May 15, 2026 (the "Prepetition Subordination Agreement") that provides, *inter alia*, for the subordination of all indebtedness and security interests of Junior Lender in favor of the prior lien, payment, and performance rights of Senior Lender with respect to the obligations of the Debtor, pursuant to the terms therein.

5. ***Interim Hearing & Interim Order.*** The Debtor sought authorization from this Court to borrow an amount not to exceed the Interim Amount of $500,00 under the DIP Loan Documents. If a final order approving the DIP Loan Documents (the "Final Order") is not entered within thirty (30) days of the entry of this Interim Order, all such extensions of credit together with accrued interest shall be immediately due and payable, unless such date is extended in writing by DIP Lender. Notwithstanding any other provision of this Interim Order or of the other DIP Loan Documents, the Debtor shall not, prior to entry of a Final Order or such other further orders as this Court may enter, incur any Post-petition Obligation in the aggregate principal amount exceeding the Interim Amount.

6. ***Service of Motion.*** Notice of the relief sought by the Motion, and the hearing with respect thereto was served on July 15, 2026 electronically via this Court's electronic case management system ("ECF Service"), hand delivery, facsimile and/or delivery to by overnight delivery service to the following parties in interest: (i) the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee"); (ii) those parties listed on the List of Creditors Holding

Largest Twenty Unsecured Claims Against the Debtor, as identified in the Debtor's chapter 11 petition; (iii) counsel to the DIP Lender; (v) the Internal Revenue Service; and (vi) all known secured creditors (collectively, the "Interim Notice Parties"). Given the nature of the relief sought in the Motion, such notice constitutes sufficient and adequate notice of this Interim Order pursuant to Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9014 and section 102(1) of the Bankruptcy Code, as required by sections 363(b) and 364(d) of the Bankruptcy Code, and no further notice of the Motion or this Interim Order is necessary or required.

7. ***Motion Granted.*** The Motion is granted in its entirety, subject to the provisions hereof. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits. This Interim Order shall become effective immediately upon its entry.

8. ***DIP Facility Authorization***. The Debtor is hereby authorized to enter into the DIP Facility, substantially in the form filed with the Court, with such modifications as permitted by this Interim Order, and the other DIP Loan Documents; and is authorized to borrow funds, obtain letters of credit, incur debt, reimbursement obligations and other obligations, grant liens, make deposits, provide guaranties and indemnities and perform its obligations solely in accordance with the terms and conditions of the DIP Loan Documents.

i. In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtor's performance of its obligations under the DIP Facility, including, without limitation:

a. the execution, delivery and performance of the DIP Loan Documents and any exhibits attached thereto;

b. the execution, delivery and performance of one or more amendments to the DIP Loan Documents, in each case in such form as the Debtor and the DIP Lender may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Loan Documents that do not shorten the maturity of the extensions of credit thereunder or increase the commitments or the rate of interest). Notwithstanding any other provision hereof, without further approval of this Court, amendments to the DIP Loan Documents may be made at any time prior to the Final Hearing;

c. the non-refundable payment to the DIP Lender of the fees referred to in the DIP Loan Documents (and in the separate letter agreements between them in connection with the DIP Facility) and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained by the DIP Lender as provided for in the DIP Loan Documents; and

d. the performance of all other acts required under or in connection with the DIP Loan Documents.

ii. All obligations owed to the DIP Lender under or in connection with the DIP Loan Documents, including, without limitation, all post-petition obligations, loans, advances, letters of credit and other indebtedness, obligations and amounts (contingent or otherwise) owing from time to time under or in connection with the DIP Loan Documents, and any and all other obligations at any time incurred by any of the Debtor to the DIP Lender, are defined and referred to herein as the "Postpetition Obligations."

9. ***Postpetition Obligations Enforceable and Valid***. Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable in accordance with their terms.

With respect to the Postpetition Obligations, no obligation, payment, transfer or grant of security under this Interim Order or the other DIP Loan Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

10. ***Cash, Cash Collateral & the Budget.***[3]

i. Subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents, the Debtor is authorized, pursuant to section 363(c)(2) of the Bankruptcy Code, to use Cash Collateral and the DIP Loan until the earlier to occur of: (i) the termination, acceleration or maturity of the Postpetition Obligations as set forth in the DIP Loan Documents; or (ii) this Interim Order or the Final Order ceases to be in full force and effect (each a "Termination Event"). The Debtor's authority to use Cash Collateral shall automatically terminate on a Termination Event without further order or relief from the Court.

ii. All of the Debtor's expenditures and cash flow shall be set forth in a budget prepared on a rolling 13-week basis (the "Budget"). The Budget shall be updated no less than once every four weeks, with the updated Budget subject to approval of the DIP Lender and to be filed with the Court. The Budget shall set forth all expenditures by the Debtor and shall include various cash flow performance benchmarks set forth in the DIP Loan Documents. The Debtor shall provide to the DIP Lender, once every four weeks, a variance report/reconciliation relating to the Budget

[3] United States quarterly fees shall be paid timely and nothing in the Budget shall alter the Debtor's obligation to pay quarterly fees in full and timely.

for the preceding four-week period and cumulative 13-week period in form and substance satisfactory to the DIP Lender (the "Variance Reports"). Prior to the repayment in full of the DIP Facility, all payments (inclusive of costs, expenses and fees) to be made by the Debtor shall be made pursuant to the Budget, subject to the rights of the Prepetition Lenders with respect to the Cash Collateral.

iii. The DIP Lender shall have the right to require in its sole discretion changes to the Budget arising from inter alia Debtor's performance and satisfaction of the Milestones (as defined below) prior to any advance.

iv. The DIP Loan shall be available only after the Debtor uses, in accordance with the Budget, all of its cash that constitutes cash collateral (as defined in Bankruptcy Code §363(a)) (the "Available Cash").

11. ***Postpetition Liens***. As collateral securing the full satisfaction of the Postpetition Obligations by the Debtor, the DIP Lender is hereby granted, as of the date of this Interim Order, and without the requirement of the execution or recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens (collectively the "Postpetition Liens"), subject only to the Carve-out (defined below), (all property identified in this paragraph 12 being collectively referred to as the "DIP Collateral"):

i. ***Second Lien on Unencumbered Property***. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, second priority senior security interest in and lien (junior only to the Secured Lender Prepetition Liens) upon all pre-petition and post-petition property of the Debtor,

whether existing on the Petition Date or thereafter acquired, to the extent such property is not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code; including without limitation, all cash and cash collateral of the Debtor and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing (collectively, "Unencumbered Property").

ii. ***Liens Junior to Perfected, Prepetition Liens***. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all pre-petition and post-petition property of the Debtor, whether now existing or hereafter acquired, that is subject to the Senior Lendor Liens and valid, perfected and allowed purchase money security interests and liens securing obligations to taxing authorities and utilities (collectively, the "Permitted Liens"), including, without limitation, in all cash and cash collateral of the Debtor and any investment of such cash and cash collateral, inventory, any accounts receivable, other right to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in

leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing.

iii. ***Priming Lien.*** Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, second priority senior security interest in and priming lien (the "Priming Lien"), junior only to the liens securing the Senior Lender Prepetition Obligations and the Permitted Liens on all assets of the Debtor, which Priming Lien shall prime all liens securing any prepetition debt obligations other than those securing the Senior Lender, and shall also be senior to any liens arising after the Petition Date to provide adequate protection, but shall not prime the Permitted Liens or the Senior Lender Prepetition Liens. The Priming Lien encumbers all pre-petition and post-petition property of the Debtor, whether existing on the Petition Date or thereafter acquired; including without limitation, all cash and cash collateral of the Debtor and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing.

iv. ***Liens Senior to Certain Other Liens.*** The Postpetition Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtor and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor other than

with respect to any liens or security interests arising after the Petition Date and permitted under the DIP Loan Documents to be senior to the Postpetition Liens.

12. ***Super-priority Claims***. In addition to the Postpetition Liens granted herein, all Postpetition Obligations shall constitute allowed, super-priority, administrative expense claims under section 503(b) of the Bankruptcy Code and under section 364(c)(1) of the Bankruptcy Code (the "Super-priority Claims") against the Debtor, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, or otherwise whether incurred in the Case or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto (a "Successor Case"). The Super-priority Claims shall be payable from, and have recourse to, all pre-petition and post-petition property of the Debtor and all proceeds thereof.

13. ***Fees & Expenses***. The Debtor is authorized, directed, and shall pay (and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary) fees and expenses that may be required under the DIP Loan Documents, as such fees and expenses become due, including, without limitation, any agent fees, commitment fees, letter of credit fees and underwriting fees and reasonable attorneys', financial advisors' and accountants' fees[4] and disbursements and fees in respect of internal auditors, all as provided for in and subject to the DIP Loan Documents. None of such reasonable attorneys', financial advisers', accountants' and internal auditors' fees and disbursements shall be subject to the approval of this Court or the

[4] The Debtor agrees to provide a copy of any invoice from DIP Lender for professional fees received to the United States Trustee upon request.

U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In addition, the Debtor is hereby authorized and directed to indemnify the DIP Lender, exclusively in its capacity as such, against any liability arising in connection with the DIP Loan Documents to the extent provided in and subject to the DIP Loan Documents. All such fees, expenses and indemnities of the DIP Lender shall constitute Postpetition Obligations and shall be secured by the Postpetition Liens and afforded all of the priorities and protections afforded to the Post-petition Obligations under this Interim Order and the other DIP Loan Documents.

14. ***Adequate Protection***.

i. The authorization of the use of the Prepetition Collateral by the Debtor shall terminate upon: (a) the Debtor's failure to make any payment specified in this paragraph to or on behalf of the Prepetition Lenders; (b) the occurrence of an Event of Default (as defined by the DIP Loan Documents); (c) the occurrence of a Termination Date; or (d) the failure to satisfy a Milestone.

ii. Debtor shall make monthly adequate protection payments to the Senior Lender equal to the non-default contractual interest required under the Senior Lender Prepetition Transaction Documents. All such adequate protection payments must be made on or before the first business day of each month.

iii. The Senior Lender and Junior Lender are granted replacement liens in all Debtor's post-petition acquired assets to the same extent, and with the same validity and priority, as the Senior Lender's and Junior Lender's prepetition liens and security interests (the "Adequate Protection Liens"). For the avoidance of doubt, the Adequate Protection Liens shall not attach to any avoidance actions (or their proceeds) arising under Chapter 5 of the Bankruptcy Code.

iv. The Prepetition Lenders and their advisors shall be given reasonable access for purposes of monitoring the business of the Debtor and the value of the Prepetition Collateral; and the Debtor shall provide the Prepetition Lenders with any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Lender.

v. Notwithstanding anything herein to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lenders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection at any time, and nothing herein shall affect the rights of any other party or entity to seek or oppose such modification of the grant of the adequate protection provided hereby. Nothing herein shall impair the rights of any party to challenge or otherwise modify the adequate protection provided herein to the Prepetition Lenders; provided, that if any additional adequate protection claims, liens or other rights are awarded at any time, such claims, liens and/or other rights shall be at all times junior in all respects to the claims and liens granted to or for the benefit of the DIP Lender and the Prepetition Lenders and shall not affect the priority, validity, binding nature, enforceability or perfection of any of such claims and liens granted to or for the benefit of the DIP Lender and the Prepetition Lenders; provided, further, that the foregoing is without prejudice to the right of the Debtor or any other party in interest, including the DIP Lender and the Prepetition Lenders, to challenge any such request.

vi. In addition, the Debtor shall satisfy the following milestones, which are also obligations under the DIP Loan Documents (the "Milestones"):

a. Obtain approval of interim Cash Collateral and interim DIP Order(s) acceptable to DIP Lender, by the Bankruptcy Court on a final, non-appealable basis by July 17, 2026

b. Approval of Final Order acceptable to DIP Lender by August 14, 2026;

c. By January 31, 2027, the Debtor shall have confirmed a Chapter 11 Plan of Reorganization or closed the sale(s) of the Debtor's assets pursuant to the *Sale Approval Order that inter alia pay the DIP Lender's claim in full*.

15. ***Perfection of Postpetition Liens & Adequate Protection Liens.***

i. All liens granted or authorized pursuant to this Interim Order, including the Postpetition Liens and the Adequate Protection Liens, to or for the benefit of the DIP Lender or the Prepetition Lenders shall, pursuant to this Interim Order be, and hereby are, valid, enforceable and perfected, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection, and all liens that may be created upon any deposit accounts or securities accounts shall, pursuant to this Interim Order be, and they hereby are, deemed to confer "control" for purposes of sections 8-106, 9-104 and 9-106 of the Uniform Commercial Code as in effect as of the date hereof in favor of the DIP Lender; provided, that if the DIP Lender shall, in its sole discretion, choose to require the execution of and/or file (as applicable) such mortgages, financing statements, notices of liens and other similar instruments and documents, all such mortgages, financing statements, notices of liens or other similar instruments and documents shall be deemed to have been executed, filed and/or recorded *nunc pro tunc* at the time and on the date of the Petition Date. Each and every federal, state and local government agency or department is hereby directed to accept the entry by this Court of this Interim Order as evidence of the validity, enforceability and perfection on the Petition Date of the liens granted or authorized pursuant to this Interim Order to or for the benefit of the DIP Lender or the Prepetition Lenders.

ii. The Prepetition Liens, the Postpetition Liens and the Adequate Protection Liens shall not be: (a) subject to any lien that is avoided and preserved for the benefit of the

Debtor's estates under section 551 of the Bankruptcy Code, the proceeds of such avoided liens being Prepetition Collateral securing the Prepetition Obligations or DIP Collateral (the Prepetition Collateral and the DIP Collateral, collectively, the "Collateral") securing the Postpetition Obligations, as applicable; or (b) subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise. No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order with respect to the Postpetition Obligations or the Senior Lender Prepetition Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction of the Senior Lender Prepetition Obligations and the Postpetition Obligations in the manner provided in the DIP Loan Documents.

iii. Effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Case or any Successor Case shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

iv. Effective upon entry of the Final Order, the Debtor hereby waives any right to assert that the Prepetition Liens do not extend to proceeds, products, offspring, or profits acquired by the Debtor after the Petition Date under "the equities of the case" doctrine or otherwise pursuant to Section 552 of the Bankruptcy Code.

16. ***Carve-out.***

i. All liens and claims granted pursuant to this Interim Order, including the Postpetition Liens, the Super-priority Claims, the Adequate Protection Liens and the Adequate Protection Claims shall be subordinate to the following expenses:

a. fees of the Clerk of the Bankruptcy Court and fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a);

b. prior to delivery of a Carve-out Trigger Notice, fees and expenses of professionals retained by the Debtor, including investment bankers, or the official committee of unsecured creditors (the "Committee"); and

c. after delivery of a Carve-out Trigger Notice, $35,000 of fees and expenses of professionals including investment bankers (but not any "success fee" or "transaction fee" owed to such professional) retained by the Debtor, any chapter 11 trustee appointed in the Chapter 11 Case and the Committee that are allowed by this Court ((a), (b) and (c) together, the "Carve-out").

ii. The term Carve-out Trigger Notice shall mean a written notice, delivered by the DIP Lender to bankruptcy counsel for the Debtor and counsel for any Committee, stating that an Event of Default (as defined in the DIP Loan Documents) has occurred and that the Post-trigger Carve-out Account is to be funded (as defined and as provided below).

iii. Upon delivery of a Carve-out Trigger Notice and to satisfy the Carve-out, the Debtor shall fund a segregated account in an aggregate amount of the amount specified in section 17(i)(c) above, plus the amount of unpaid Budgeted professional fees and expenses incurred by the Debtor or any Committee prior to the date of the Carve-out Trigger Notice (the "Post-trigger Carve-out Account"), to be used to satisfy the Post-Default Carve-Out as defined in the DIP Loan Documents, and any remaining balance shall then pay first any remaining Secured Lender Prepetition Obligation, then any remaining Postpetition Obligation, and then any remaining Junior Lender Prepetition Obligation.

iv. The Carve-out and amounts in the Post-Default Carve-out Account shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Debtor, a Committee, or any of their professionals, to: (a) object to or contest in any manner, or raise any defenses to, the validity, perfection, priority, extent, amount or enforceability of: the Prepetition Obligations, the Prepetition Liens, the Postpetition Obligations or the Postpetition Liens (except to the extent of up to $5,000 of fees and expenses incurred by a Committee to investigate the validity, perfection, priority, extent, amount or enforceability of: the Prepetition Obligations and the Prepetition Liens); or (b) assert any claims or causes of action against the Prepetition Lenders or the DIP Lender, or their respective advisors, agents and sub-agents, including discovery proceedings in anticipation thereof, or in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Lenders or the DIP Lender.

v. Nothing herein shall constitute a waiver by the Prepetition Lenders or the DIP Lender of their rights to object to the fees and expenses of any professional retained by the Debtor or a Committee, all such rights being fully reserved.

17. ***Limitation on Use of Collateral and DIP Facility Proceeds***. Notwithstanding anything herein to the contrary, amounts loaned or advanced under, or in connection with, the DIP Facility, any and all proceeds of collateral and all existing and future cash collateral may not be used, directly or indirectly, by any Debtor, Committee, or any other person or entity to: (a) object to, contest in any manner, or raise any defenses to, the validity, perfection, priority, extent, amount or enforceability of the DIP Facility, any DIP Loan Document, any Postpetition Obligation, any Postpetition Lien or Super-priority Claim; (b) assert any claims or causes of action against the DIP Lender or any Prepetition Lender or their respective advisors, agents and sub-agents, including

discovery in anticipation thereof, or in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation involving the DIP Lender or any Prepetition Lender; (c) upon the occurrence of a Termination Event, prevent, hinder or otherwise delay the Prepetition Lenders' or the DIP Lender's assertion, enforcement or realization on Prepetition Collateral or DIP Collateral, as applicable, in accordance with the DIP Loan Documents, the Prepetition Transaction Documents or this Interim Order; (d) seek to modify any of the rights granted to the DIP Lender or the Prepetition Lenders hereunder, under the DIP Loan Documents or the Prepetition Transaction Documents, in each of the foregoing case without such parties' prior written consent; (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (1) approved by an Order of this Court and (2) in accordance with the Budget; (f) seek authorization, or support any other person or entity seeking authorization, to use any Cash Collateral without the consent of the DIP Lender; or (g) obtain a lien senior to, or on a parity with, the liens of the DIP Lender in any DIP Collateral or any portion thereof.

18. ***Preservation of Rights***.

i. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the DIP Lender or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, any right of the DIP Lender or Prepetition Lenders to: (1) request modification of the automatic stay of section 362 of the Bankruptcy Code; (2) request dismissal of any of the Case, conversion of any of the Case to case under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner (including with expanded powers); or (3) propose, subject to the provisions of section

1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (4) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender or the Prepetition Lenders.

ii. The Postpetition Obligations, the Prepetition Obligations and the Adequate Protection Obligations, and the claims and liens granted to or for the benefit of the DIP Lender and the Prepetition Lenders pursuant to this Interim Order and the other DIP Loan Documents, are not subject to any setoff or reduction of any kind, including, without limitation, under section 502(d) of the Bankruptcy Code, and shall not be discharged by the entry of an order: (a) confirming a chapter 11 plan in the Case (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor hereby waives such discharge); or (b) converting the Case to a case under chapter 7 of the Bankruptcy Code. Under no circumstances shall any chapter 11 plan in this Case be confirmed or become effective unless such plan provides that the Postpetition Obligations shall be paid in full in cash and satisfied in the manner provided in the DIP Loan Documents on or before the effective date of such plan.

iii. Based upon the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the commitments to extend the DIP Loan contemplated by this Interim Order, in the event that any or all of the provisions of this Interim Order or any other DIP Loan Documents, including the Final Order, are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any lien or claim authorized or created hereby or thereby or any Postpetition Obligations incurred hereunder or thereunder. Notwithstanding any such modification, amendment or vacation, any Postpetition Obligations incurred and any claim granted to the DIP Lender and the Prepetition Lenders hereunder or under the other DIP Loan Documents, including the Final Order, arising prior to the

effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Interim Order and the other DIP Loan Documents, including the Final Order, and the DIP Lender and the Prepetition Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein and therein.

iv. The validity, enforceability, priority or amount of any of the claims and liens granted to or for the benefit of the DIP Lender under this Interim Order or any other DIP Loan Documents with respect to the Postpetition Obligations shall not be affected by any finding or order of this Court or any other court regarding any Prepetition Secured Lender or Prepetition Liens, including, without limitation, any order of this Court or any other Court invalidating any Prepetition Obligation or Prepetition Liens.

v. To the extent that any Postpetition Obligations remain unpaid, any amounts disgorged by the Prepetition Lenders in respect of any of the Prepetition Obligations (whether such amounts were received by the Prepetition Lenders prior or subsequent to the Petition Date) shall upon such disgorgement be immediately delivered by the Debtor to the DIP Lender to be applied to repay the Postpetition Obligations in accordance with the terms of the DIP Loan Documents; provided, to the extent any Senior Lender Prepetition Obligations remain unpaid, any amounts disgorged by the Junior Lender in respect of any Junior Lender Prepetition Obligation (whether such amounts were received by the Junior Lender prior or subsequent to the Petition Date) shall upon such disgorgement be immediately delivered by the Debtor to the Senior Lender to be applied to repay the Senior Lender Prepetition Obligations in accordance with the terms of the Senior Lender Prepetition Transaction Documents, with any remaining disgorged amounts then applied to to repay the Postpetition Obligations in accordance with the terms of the DIP Loan Documents.

19. ***Release.***

i. In consideration of their consent to entry of this Order, Debtor hereby forever releases, waives and discharges each Prepetition Lender, together with its respective officers, directors, employees, agents, sub-agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors (collectively, the "Released Parties"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any: (a) Prepetition Transaction Document; (b) aspect of the Prepetition relationship between a Debtor and any or all of the Released Parties, or (c) other acts or omissions by any or all of the Released Parties including, without limitation, any claims or defenses as to the extent, validity, priority or perfection of the Prepetition Liens or Prepetition Obligations, "lender liability" claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action and any resulting subordination or recharacterization of any payments made to any Prepetition Lender pursuant to this Interim Order (all such claims, defenses and other actions described in this paragraph are collectively defined as the "Claims and Defenses"). Nothing contained in this subparagraph shall affect the rights of any Committee or any other party in interest to undertake any action with respect to, including, without limitation, any investigation or prosecution of, Claims and Defenses that is permitted in the other subparagraphs of this paragraph, subject to any other applicable terms of this Interim Order.

ii. The Committee may file a complaint pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate or otherwise challenge the Debtor's Admissions, Prepetition Liens or the Prepetition Obligations; provided, that any such complaint must be filed in this Court within forty-five (45) days after the formation of any such Committee (the "Challenge Deadline"). If no such complaint is filed before the Challenge Deadline, then any and all Claims and Defenses

against any of the Released Parties shall be, without further notice or order of the Court, forever relinquished, released and waived as to such Committee and all other persons and entities. If such a complaint is timely filed before the Challenge Deadline, any and all Claims and Defenses against any of the Released Parties shall be immediately and without further action forever relinquished, released and waived as to such Committee and every other person or entity, except with respect to Claims and Defenses that are expressly asserted in such complaint.

iii. If no such complaint as to any Prepetition Lien, the Prepetition Obligation, the Prepetition Transaction Documents or the Released Parties is filed before the Challenge Deadline, then, without the requirement or need to file any proof of claim with respect thereto: (a) the Prepetition Obligations shall constitute allowed, fully secured claims for all purposes in the Case and any Successor Case; (b) the Prepetition Liens shall be deemed legal, valid, binding, enforceable, perfected, not subject to subordination (except for the subordination thereof to the Postpetition Liens and as otherwise specified in this Interim Order and the DIP Loan Documents, as applicable) or avoidance for all purposes in the Case and any Successor Case; (c) the release of the Claims and Defenses shall be binding on all parties in interest in the Case and any Successor Case, and (d) the Prepetition Obligations, the Prepetition Liens, releases of the Claims and Defenses against the Released Parties, and prior payments on account of or with respect to the Prepetition Obligations, respectively, not subject to any such complaint shall not be subject to any other or further claims, cause of action, objection, contest, setoff, defense or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor. Nothing in this Interim Order shall confer or deny standing upon the Committee or any other person or entity to bring, assert, commence, continue, prosecute or litigate the Claims and Defenses against any Released Party.

20. ***Survival of Certain Rights***. Notwithstanding anything herein or in any other DIP Loan Document, upon the occurrence of the DIP Termination Date (as defined in the DIP Loan Documents), all of the rights, remedies, benefits and protections provided: (i) to the DIP Lender under this Interim Order and the other DIP Loan Documents; and (ii) to the Prepetition Lenders under this Interim Order and the Prepetition Transaction Documents, shall survive such Termination Date. Upon such Termination Date, the principal of and all accrued interest and fees and all other Postpetition Obligations shall be immediately due and payable and the DIP Lender shall have all other rights and remedies provided in this Interim Order, the other DIP Loan Documents and applicable law.

21. ***Rights Upon Case Dismissal***. Until all obligations and indebtedness owing to the DIP Lender shall have been paid in full in cash and satisfied in the manner provided in the DIP Loan Documents and this Interim Order, no Debtor shall seek an order dismissing the Case. If an order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349(b) of the Bankruptcy Code) that: (i) the claims and liens granted pursuant to this Interim Order to or for the benefit of the DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been paid in full in cash and satisfied in the manner provided in the DIP Loan Documents (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the claims and liens granted pursuant to this Interim Order to or for the benefit of the Prepetition Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (iii) that prior to dismissal, the applicable Debtor shall deliver to the DIP Lender and

record, at the Debtor's cost, financing statements, mortgages and other documentation evidencing perfected liens in the DIP Collateral; and (iv) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and liens.

22. ***Events of Default***.

i. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence of any Event of Default (as defined in the DIP Loan Documents), all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to this Court: (a) terminate the Debtor's use of Cash Collateral and cease to make any loans or advances to the Debtor; (b) declare all Postpetition Obligations to be immediately due and payable; (c) terminate any unfunded commitments under the proposed DIP Facility; (d) set off and apply immediately any and all amounts in accounts maintained by the Debtor with any DIP Lender and the Prepetition Lenders (except accounts maintained for the benefit of the Senior Lender to the extent the Senior Lender Prepetition Obligations are not satisfied upon an Event of Default) against the Postpetition Obligations, and otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lender and the Prepetition Lenders for application towards the Postpetition Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the other DIP Loan Documents or applicable law to effect the repayment and satisfaction of the Postpetition Obligations; provided, that the DIP Lender shall provide five (5) business days written notice (by facsimile, telecopy, electronic mail or otherwise) to the U.S. Trustee, counsel to the Debtor and counsel to any Committee prior to exercising any enforcement rights or remedies in respect of the DIP Collateral (other than the rights described in clauses (a), (b) and (c) above (to the extent they

might be deemed remedies in respect of the DIP Collateral) and other than with respect to freezing any deposit accounts or securities accounts); provided further, that the Debtor shall have the right to seek continuation of the automatic stay during such five (5) days period solely on the basis that no Event of Default has occurred.

ii. No holder of a lien primed by this Interim Order or granted by the Debtor as adequate protection shall be entitled to object on the basis of the existence of any such lien to the exercise by the DIP Lender of its rights and remedies under the DIP Loan Documents or under applicable law to effect satisfaction of the Postpetition Obligations or to receive any amounts or remittances due hereunder or under the other DIP Loan Documents. The DIP Lender shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of this Interim Order and the other DIP Loan Documents, and except to the extent specifically provided herein, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or otherwise.

iii. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the other DIP Loan Documents or otherwise. The failure or delay by the (a) DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or any other DIP Loan Documents or (b) Prepetition Lenders to exercise its rights and remedies under this Interim Order shall not constitute a waiver of any of the rights of the DIP Lender or Prepetition Lenders hereunder, thereunder or otherwise, and any single or partial exercise of such rights and remedies against any party or DIP Collateral shall not be construed to limit any further exercise of such rights and remedies against any or all of the other party and/or DIP Collateral.

iv. ***Scheduling of a Final Hearing and Objection Deadline.*** The deadline to file an objection to this Order is ___________, 2026. If an objection is timely filed, the final hearing will be held as required by L.B.R. 4001-2 on ________________, 2026 at __:__, _.m. (the "Hearing Date"), at 211 W. Fort St., Courtroom __, Detroit, Michigan 48226. If no objection is timely filed, this Order will become a Final Order immediately after the Hearing Date without further notice or hearing.

v. ***Notice***. The Debtor shall, within two business days of entry of this Order, serve by ECF Service, or by United States mail, first class postage prepaid, copies of the Motion (to the extent not already served), this Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the Final Order on all parties who are required to be served under Fed. R. Bankr. P. 4001(d). Copies of the Motion, this Interim Order and the Final Hearing Notice also shall be served upon all persons requesting service of papers before the Final Hearing pursuant to Bankruptcy Rule 2002 by ECF Service, email, or by United States mail, first class postage prepaid within one business day following the receipt of such request.

23. ***Binding Effect; Successors and Assigns***. This Interim Order is hereby deemed effective immediately pursuant to Federal Bankruptcy Rules of Procedure §6004(h). The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, each Prepetition Lender and the Debtor and their respective successors and assigns, including any chapter 7 trustee or other trustee or fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the estates of the Debtor in a Successor Case.

24. ***Conflict***. In the event that any provision of this Interim Order conflicts with any term of the other DIP Loan Documents, this Interim Order shall govern.

# EXHIBIT 5

*Declaration in Support of First Day Motions*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In re:**

**PHOENIX PRESS, LLC**

Case No. 26-47856
Chapter 11
Hon. Thomas J. Tucker

Debtor.
_______________________________________/

**DECLARATION OF KIRK R. VERCNOCKE**
**IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

I, Kirk R. Vercnocke, state as follows:

1. I am the President of Phoenix Press, LLC ("Debtor"). I am familiar with the facts and circumstances set forth in this Declaration, and I am in all respects competent to make this Declaration in Support of the Debtor's first day motions for use of cash collateral and for authority to pay pre-petition wage obligations (the "First Day Motions").[1]

2. I am familiar with the day-to-day operations, financial affairs, and books and records of Debtor. I am familiar with the First Day Motions and the facts set forth therein. Except as otherwise stated, this Declaration is based upon personal knowledge.

3. To the best of my knowledge, information and belief, the facts set forth in the First Day Motions are true and correct.

[1] Except as otherwise stated, all capitalized terms not defined in this Declaration have the meaning ascribed to them in the First Day Motions.

### ***Background***

4. Debtor operates under the trade name Phoenix Innovate and is a full-service, national marketing solutions provider with proprietary technological tools and direct and digital marketing solutions. Debtor's services include digital printing, graphics and displays, direct mail programs, digital marketing, research and data analysis, application development and custom software integrations, marketing strategy, production execution, warehousing and fulfillment, and project management.

5. Debtor employs 95 employees: 56 salaried employees, including myself, 28 hourly employees, and eight contract employees. Debtor relies on its employees for all its operations. Debtor is also required to make payments on behalf of the communities that it manages and to fund Debtor's costs of operations. Debtor cannot continue operations if it is not authorized to use cash collateral and pay employee wages.

### ***Reasons for Filing***

6. In 2024, Debtor acquired a marketing business based in Virginia (the "Lukens Business"). Debtor borrowed $8,000,000 from Bender Equity LLC ("Junior Lender"), used approximately $5,000,000 in Debtor's funds, and assumed debts and liabilities of the Lukens Business. The projections for the Lukens Business turned out to be significantly overstated and never made the expected profits. Among other missed projections, the Lukens Business projected revenues in the second half of 2024 of $50 million. Just 44 days after the acquisition closed, the projections were revised to $25 million for the same period. In April 2026, many key employees of the Lukens Business left the company and began working for a prospective purchaser of the Lukens

Business. The Lukens Business has been a total loss and created a liquidity and solvency crisis for Debtor.

7. Debtor's core business remains strong and profitable. Debtor intends through the Chapter 11 to complete the wind-down the Lukens Business and focus its resources on its core business.

8. Debtor's immediate need for financing results from equipment problems at its Troy facility. Debtor requires continual use of this equipment to continue operations and produce product on behalf of its customers. The equipment has been down for almost a week and Debtor does not have any ability to repair or use the equipment without making cash in advance payments to Debtor's sole-source servicers, Canon Solutions America, Inc. and Bell & Howell. Even with cash in advance payments, these sole-source servicers had indicated they would not provide service before a bankruptcy filing and a plan to receive post-petition payments.

9. Debtor has also been unable to make payments to other vendors and suppliers, negatively affecting Debtor's business. Among other things, Debtor is at risk of contract and lease terminations for payment defaults and needs the relief afforded by a Chapter 11 filing to restructure its obligations.

10. Debtor believes that its post-petition operations will be profitable, and that continuation of Debtor's business will benefit Debtor, Debtor's business partners and the residents of the communities managed by Debtor, and all creditors.

11. Accordingly, Debtor commenced this Chapter 11 bankruptcy case as the only available avenue to continue operations for the benefit of all creditors.

### *Cash Collateral and DIP Loan Motion*

12. The cash flow projections attached to the First Day Motion requesting authorization to use cash collateral represents the Debtor's estimates of its financial requirements during the next 13 weeks.

13. The cash flow projections were prepared under my direction. I believe that the cash flow projections accurately estimate Debtor's cash flow needs.

14. Based on my experience, my understanding of Debtor's operations and financial condition, I believe that if Debtor is permitted to use cash collateral, Debtor will generate new receivables and reimbursements and, ultimately, new cash, in excess of the cash collateral used by Debtor; that is, based on all the information available to me, I project that Debtor will be operationally profitable over the next two months.

15. According to the cash flow projections, Debtor will need to disburse approximately $2,374,380 in cash collateral during the initial four weeks of this case. Debtor intends to borrow $500,000 under the DIP Loan and to use cash collateral to fund the remaining disbursements of $1,874,830. Debtor requires the use of cash collateral and the DIP Loan for payroll obligations, maintenance, insurance, automotive lease payments, rent payments, and other ordinary course expenses. Debtor will also require use of cash collateral and the DIP Loan for expenses relating to this Chapter 11 bankruptcy case.

16. If Debtor is not able to use cash collateral by July 16, 2026, Debtor will be unable to timely make payroll. This will negatively impact morale of Debtor's employees, create a serious risk that employees will not continue working, and will, therefore, jeopardize Debtor's ability to continue operations. Debtor will also be unable to restore

operations at its Troy facility until the DIP Loan and use of cash collateral are approved, increasing Debtor's losses and substantially increasing the likelihood that Debtor will permanently lose customers to the substantial detriment of Debtor's estate and all creditors.

17. If interim authorization is not granted, Debtor's customers will terminate their contracts with Debtor and find replacement companies on an emergency basis. This uncontrolled and sudden shut down of operations is expected to result in very large damages claims by Debtor's customers, which they will attempt to set-off against Debtor's receivables and reimbursements. Accordingly, not only will Debtor's operations be terminated, but Debtor would also likely lose a large percentage of its receivables to the detriment of all creditors.

18. Therefore, if Debtor is unable to obtain authorization to use cash collateral on an interim basis by July 16, 2026, Debtor will suffer immediate and irreparable harm.

***Payroll Motion***

19. Before the Petition Date, Debtor paid its salaried employees for services provided through July 15, 2026.

20. Debtor has payroll for hourly and contract employees due on Friday, July 17, 2026, which must be funded to Debtor's third-party service provider by the close of business on July 16, 2026. The payroll that Debtor intends to make on July 16, 2026 will pay for all wages of Debtor's hourly and contract employees incurred from June 28 through July 11, 2026 and approximates $70,000.

21. The details regarding Debtor's employees, payroll, and benefits set forth in the Payroll Motion are true and accurate to the best of my knowledge, information and belief.

22. No individual will be paid more than $17,150 in pre-petition wages or salary.

23. If Debtor's payroll obligations are not met, the Debtor will suffer irreparable harm through the loss of key employees. Debtor will not be able to retain and train replacement employees without substantial disruption to Debtor's operations. As discussed above, any substantial interruption in Debtor's operations will almost certainly result in large damages claims, setoffs, and loss of business from which Debtor will be unable to recover.

24. Further, failure to make timely payroll will have immediate and severe consequences on Debtor's employees, many or all of whom require timely payment to purchase necessary goods and services and to make payments to their own creditors.

25. I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 15, 2026 /s/ Kirk R. Vercnocke
Kirk R. Vercnocke

Executed in Anderson, Indiana

# EXHIBIT 6.A

*Budget*

**SUMMARY CASH FLOW PROJECTIONS**

# PHOENIX PRESS

**CONFIDENTIAL**

| *Period from July 13 to October 11, 2026* | Week 1<br>13-Jul | Week 2<br>20-Jul | Week 3<br>27-Jul | Week 4<br>3-Aug | Week 5<br>10-Aug | Week 6<br>17-Aug | Week 7<br>24-Aug | Week 8<br>31-Aug | Week 9<br>7-Sep | Week 10<br>14-Sep | Week 11<br>21-Sep | Week 12<br>28-Sep | Week 13<br>5-Oct | **13-WEEK TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Existing A/R - Phoenix | $ 82,461 | $ 238,085 | $ 1,183,061 | $ 437,148 | $ 315,835 | $ 318,841 | $ 94,804 | $ 166,340 | $ 9,368 | $ 151,433 | $ 72,228 | $ 15,899 | $ 6,184 | $ 3,091,687 |
| Projected A/R - Phoenix | - | - | 30,000 | - | 224,467 | 48,517 | 219,762 | 478,563 | 273,815 | 201,340 | 387,534 | 648,764 | 156,231 | 2,668,993 |
| Existing A/R - TLC | 113,370 | 79,906 | 43,285 | 154,888 | 10,188 | 115,584 | - | 54,276 | - | 35,807 | - | 91,144 | - | 698,448 |
| Amplified CC Receipts | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,000 |
| Rental Income - Sublease | - | - | - | 12,000 | - | - | - | 12,000 | - | - | - | 12,000 | - | 36,000 |
| Postage Reimbursement | 10,000 | 10,000 | 69,463 | 96,909 | 62,972 | 103,000 | 60,972 | 120,000 | 58,000 | 103,000 | 60,972 | 120,000 | 58,000 | 933,288 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Receipts | $ 208,832 | $ 330,991 | $ 1,328,810 | $ 703,945 | $ 616,461 | $ 588,942 | $ 378,537 | $ 834,179 | $ 344,183 | $ 494,580 | $ 523,734 | $ 890,806 | $ 223,415 | $ 7,467,415 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | | |
| Pre-Petition A/P | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Projected COD A/P | 243,000 | 245,000 | 100,000 | 50,000 | 65,000 | 230,000 | 75,000 | 95,000 | 88,000 | 145,000 | 165,000 | 135,000 | 85,000 | 1,721,000 |
| Payroll Expense | 71,357 | 27,083 | 411,918 | 27,083 | 306,733 | 27,083 | 66,317 | 282,442 | 89,859 | 238,541 | 89,859 | 276,874 | 24,091 | 1,939,239 |
| Facility Costs | 5,000 | 26,823 | 156,825 | 21,000 | 12,000 | 19,823 | 100,475 | 107,373 | 11,000 | 20,823 | 55,475 | 112,373 | 11,000 | 659,990 |
| Insurance Premiums | - | 147,966 | - | 17,000 | 110,000 | 16,000 | - | 17,000 | 108,000 | 16,000 | - | - | 17,000 | 448,966 |
| Administrative Costs * | 69,463 | 98,842 | 63,572 | 103,000 | 60,972 | 122,000 | 58,600 | 103,000 | 60,972 | 122,000 | 58,600 | 58,000 | 58,000 | 1,037,021 |
| Debt Service | 40,500 | - | 277,550 | 44,419 | - | - | - | 304,854 | 21,000 | - | - | 283,448 | 44,419 | 1,016,190 |
| Professional Fees | - | - | - | 115,000 | - | - | - | 115,000 | - | - | - | 115,000 | - | 345,000 |
| Other Disbursements | 1,450 | 1,450 | 7,450 | 2,080 | 1,450 | 1,450 | 7,450 | 2,080 | 1,450 | 1,450 | 7,450 | 2,080 | 1,450 | 38,740 |
| Total Cash Disbursements | $ 430,771 | $ 547,164 | $ 1,017,314 | $ 379,581 | $ 556,155 | $ 416,356 | $ 307,843 | $ 1,026,749 | $ 380,280 | $ 543,814 | $ 376,384 | $ 982,774 | $ 240,960 | $ 7,206,144 |
| **NET OPERATING CASH FLOW** | $ (221,939) | $ (216,172) | $ 311,495 | $ 324,363 | $ 60,306 | $ 172,586 | $ 70,695 | $ (192,570) | $ (36,097) | $ (49,234) | $ 147,350 | $ (91,968) | $ (17,545) | $ 261,271 |
| *Cumulative Cash Flow* | *(221,939)* | *(438,111)* | *(126,616)* | *197,747* | *258,053* | *430,640* | *501,335* | *308,765* | *272,667* | *223,434* | *370,784* | *278,816* | *261,271* | |
| **CASH BALANCES** | | | | | | | | | | | | | | |
| Beginning Balance | $ - | $ 78,061 | $ 61,889 | $ 373,384 | $ 697,747 | $ 908,053 | $ 1,080,640 | $ 1,151,335 | $ 1,108,765 | $ 1,072,667 | $ 1,023,434 | $ 1,170,784 | $ 1,078,816 | $ - |
| Plus: Cash Receipts | 208,832 | 330,991 | 1,328,810 | 703,945 | 616,461 | 588,942 | 378,537 | 834,179 | 344,183 | 494,580 | 523,734 | 890,806 | 223,415 | 7,467,415 |
| Less: Cash Disbursements | (430,771) | (547,164) | (1,017,314) | (379,581) | (556,155) | (416,356) | (307,843) | (1,026,749) | (380,280) | (543,814) | (376,384) | (982,774) | (240,960) | (7,206,144) |
| Plus: DIP Loan Draws | 300,000 | 200,000 | - | - | 150,000 | - | - | 150,000 | - | - | - | - | - | 800,000 |
| Ending Cash Balance | $ 78,061 | $ 61,889 | $ 373,384 | $ 697,747 | $ 908,053 | $ 1,080,640 | $ 1,151,335 | $ 1,108,765 | $ 1,072,667 | $ 1,023,434 | $ 1,170,784 | $ 1,078,816 | $ 1,061,271 | $ 1,061,271 |
| DIP LOC Balance | $ 300,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 650,000 | $ 650,000 | $ 650,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | |
| Internex Loan Balance | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | 1,905,264 | |
| Total | $ 2,205,264 | $ 2,405,264 | $ 2,405,264 | $ 2,405,264 | $ 2,555,264 | $ 2,555,264 | $ 2,555,264 | $ 2,705,264 | $ 2,705,264 | $ 2,705,264 | $ 2,705,264 | $ 2,705,264 | $ 2,705,264 | |
| **CASH PLUS RECEIVABLES **** | | | | | | | | | | | | | | |
| Beginning Receivables | $ 5,163,815 | $ 5,215,283 | $ 5,303,558 | $ 5,104,894 | $ 4,616,108 | $ 4,178,119 | $ 3,909,841 | $ 4,557,430 | $ 4,183,051 | $ 4,190,868 | $ 4,026,952 | $ 4,397,494 | $ 4,318,938 | $ 5,163,815 |
| Plus New Sales Invoicing | 247,300 | 406,266 | 1,057,682 | 103,250 | 112,500 | 214,664 | 962,155 | 324,800 | 291,000 | 224,664 | 830,304 | 677,250 | 141,800 | 5,593,635 |
| Less Collections | (195,832) | (317,991) | (1,256,346) | (592,036) | (550,489) | (482,942) | (314,566) | (699,179) | (283,183) | (388,580) | (459,762) | (755,806) | (162,415) | (6,459,128) |
| Ending Accounts Receivable | $ 5,215,283 | $ 5,303,558 | $ 5,104,894 | $ 4,616,108 | $ 4,178,119 | $ 3,909,841 | $ 4,557,430 | $ 4,183,051 | $ 4,190,868 | $ 4,026,952 | $ 4,397,494 | $ 4,318,938 | $ 4,298,323 | $ 4,298,323 |
| | | | | | | | | | | | | | | Change +/(-) |
| Total Ending Cash & Receivables | $ 5,293,345 | $ 5,365,447 | $ 5,478,278 | $ 5,313,855 | $ 5,086,172 | $ 4,990,481 | $ 5,708,765 | $ 5,291,816 | $ 5,263,536 | $ 5,050,386 | $ 5,568,278 | $ 5,397,754 | $ 5,359,594 | $ 66,249 |
| **Cash & Receivables in Excess of DIP & Internex** | **$ 3,088,081** | **$ 2,960,184** | **$ 3,073,014** | **$ 2,908,592** | **$ 2,530,909** | **$ 2,435,217** | **$ 3,153,501** | **$ 2,586,552** | **$ 2,558,272** | **$ 2,345,122** | **$ 2,863,014** | **$ 2,692,490** | **$ 2,654,330** | |

** Includes reimbursed postage expense*

*** Collateral does not include inventory value. Note that $698,448 of receivables from recently dissolved TLC division are collected and not replenished over the period.*

*Note: US Trustee fees incurred during the quarter and payable in October:* $ 28,825

# EXHIBIT 6.B

*DIP Loan Term Sheet*
*and*
*DIP Credit Agreement*

## <u>Summary of Terms of Proposed DIP Financing</u>

| <u>Transaction Term</u> | <u>Description</u> |
|---|---|
| **DIP Lender..........** | PI DIP, LLC ("**DIP Lender**") |
| **Borrower .............** | Phoenix Press, LLC, as a debtor and debtor-in-possession |
| **DIP Facility .................** | The debtor-in-possession financing shall be in the form of a second-position (second to Internex Capital Funding LLC ("**Senior Lender**")) secured, super-priority loan, pursuant to Section 364 of the Bankruptcy Code, which shall consist of a revolving loan in an aggregate maximum principal amount of up to $[] on an interim basis, and up to $810,000 on a final basis (the "**DIP Loan**"). |
| **Certain Conditions ...........** | The initial availability of the DIP Loan shall be conditioned upon satisfaction or waiver of, including without limitation, the following conditions precedent (the date upon which all such conditions precedent shall be satisfied or waived, the "**Closing Date**"):<br>• The Borrower shall have executed and delivered definitive financing documentation with respect to the DIP Loan that is satisfactory to the DIP Lender (the "**DIP Loan Documents**");<br>• The Borrower shall have delivered an initial Budget;<br>• The DIP Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented, in each case to the extent required to be paid by the Borrower, on or before the Closing Date;<br>• The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the DIP Lender, an interim order of the Bankruptcy Court authorizing and approving the DIP Loan (the "**Interim Order**");<br>• The Interim Order shall not have been reversed, modified or amended without the prior written consent of the DIP Lender, stayed, vacated or subject to any pending appeal;<br>• The Borrower shall be in compliance with the Interim Order; and<br><br>Conditions to each extension of the DIP Loan shall be conditioned upon satisfaction or waiver of the following:<br>• Accuracy of all representations and warranties in the DIP Loan Documents;<br>• There being no default or event of default;<br>• Within thirty (30) days from the entry of the Interim Order, the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the DIP Lender, a final order of the Bankruptcy Court authorizing and approving the DIP Loan (the "**Final Order**"); and<br>• The Final Order shall not have been reversed, modified or amended without the prior written consent of the DIP Lender, stayed, vacated or subject to any pending appeal. |
| **Use of Proceeds................** | Proceeds of the DIP Loan shall be used to (i) make payments of interest, fees and costs as required by the DIP Loan Documents, and (ii) make payments in accordance with the Budget. |
| **Budget..................** | Borrower shall provide an approved thirteen-week cash flow forecast budget acceptable to the DIP Lender, to be prepared and updated by a financial advisor retained by the Borrower, approved by the Bankruptcy Court, and acceptable to the DIP Lender (the "**Budget**"). The DIP Lender shall have the right to require in its sole discretion changes to the Budget arising from *inter alia* Debtor's performance and satisfaction of the |

| TRANSACTION TERM | DESCRIPTION |
| --- | --- |
| | Milestones prior to any advance.<br><br>The Borrower shall provide to the DIP Lender a variance report/reconciliation once every four weeks relating to the Budget for the preceding four-week period and cumulative 13-week period in form and substance satisfactory to the DIP Lender. The foregoing collectively referred to as the "**Variance Report**". |
| **Term .....................** | Unless extended by written consent of the DIP Lender, the DIP Loan shall mature on the earlier of (i) January 31, 2027, (ii) the effective date of a confirmed Chapter 11 Plan of Reorganization or (iii) the closing of the sale of substantially all of the assets of the Borrower authorized and approved by a Bankruptcy Court Order on a final, non-appealable basis (the "**Termination Date**"). |
| **Interest .................** | Interest shall accrue at a per annum rate equal to 11.5% (the "**Interest Rate**"). |
| **Default Rate .........** | After and during the continuance of an Event of Default, interest shall accrue at the Interest Rate *plus* 2% per annum. |
| **Fees .......................** | Attorneys' fees shall be paid to the DIP Lender on an ongoing basis and shall be included in the Budget.<br><br>Other fees may include customary servicing and audit/collateral monitoring fees. |
| **Security.................** | Second priority (second to Senior Lender) priming lien on all existing and after-acquired personal and real property other than (i) the fees of the clerk of the Bankruptcy Court and fees of the United States Trustee, (ii) prior to a carve-out trigger notice, fees and expenses of professionals retained by the Borrower or any committee, (iii) after an Event of Default and issuance of carve-out trigger notice, fees and expenses of professionals retained by the Borrower, any chapter 11 trustee appointed in the Bankruptcy Case and the committee up to a specified limited amount (but not any Transaction Fee of any investment banker); and (iv) Permitted Liens. |
| **Repayment ...........** | The Borrower shall make monthly payments of interest on the first (1st) Business Day of each month while such DIP Loan is outstanding. All amounts of principal and interest shall be due on the Termination Date. |
| **Financial Reporting and Controls .......** | Updated 13-week cash flow forecasts no less than once every 4 weeks; other monthly and yearly reporting requirements. |
| **Events of Default Include ..................** | The following shall be Events of Default, and each an Event of Default:<br>• Nonpayment of principal when due;<br>• Nonpayment of interest, fees or other amounts;<br>• Material inaccuracy of representations and warranties;<br>• Violation of covenants;<br>• The use of proceeds from the DIP Loan in any manner inconsistent with the DIP Loan Documents or the Interim Order or Final Order;<br>• The invalidity of any post-petition lien or security document;<br>• Failure to comply with the Budget requirements (including any negative variance equal to or greater than 15% between the Budget net cash flow and the Variance Report net cash flow in any four-week period);<br>• Failure to meet any Milestone;<br>• The failure to approve a Section 506(c) waiver and a waiver of the "equities of the case" exception in Section 552(b) in the Final Order; |

| TRANSACTION TERM | DESCRIPTION |
|---|---|
| | • The grant of a priming lien pursuant to Section 364(d) to any party other than DIP Lender or Senior Lender that does not result in payment in full of the DIP Loan; and |
| **Representations and Warranties ...........** | Customary representations and warranties, including, without limitation, organization, power and authority, loan documents; laws; taxes; legal actions; financial statements; no material adverse change; compliance with laws and other requirements; no defaults; perfection of security interests, and secured super-priority claims. |
| **Affirmative Covenants.............** | Customary affirmative covenants including, without limitation, compliance with laws; payment of post-petition obligations; inspections and cooperation; payment and performance; indemnification; maintenance of existence and records.<br><br>In addition, the Borrower shall satisfy the following milestones (each individually, and collectively, the "**Milestones**"):<br>• Obtain approval of interim Cash Collateral and interim DIP Order(s) acceptable to DIP Lender, by the Bankruptcy Court on a final, non-appealable basis by July 17, 2026;<br>• Approval of Final Order acceptable to DIP Lender by August 14, 2026; and<br>• By January 31, 2027, the Borrower shall have confirmed a Chapter 11 Plan of Reorganization or closed the sale(s) of the Borrower's assets pursuant to the Sale Approval Order. |
| **Negative Covenants ...............................** | Limitations on: commingling; indebtedness; liens; modifications or amendments of organizational documents; transfers; distributions; bankruptcy matters. |

# <u>SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT</u>

This Superpriority Secured Debtor-in-Possession Credit Agreement (this "**Agreement**"), dated as of July __, 2026, is by and between PHOENIX PRESS, LLC, a Michigan limited liability company, as a debtor in possession ("**Borrower**" or "**Debtor**"), and PI DIP, LLC, a Michigan limited liability company (as "**DIP Lender**").

WHEREAS, on July 13, 2026 (the "**Petition Date**"), the Borrower filed a voluntary petition with the Bankruptcy Court initiating the Case and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on May 15, 2026, the Borrower and InterNex Capital Funding, LLC and InterNex Capital, LLC, Delaware limited liability companies (collectively, the "**Senior Lender**"), entered into that certain Loan and Security Agreement, as amended through the date hereof (as amended, the "**Prepetition Credit Agreement**"; the aggregate loans made pursuant thereto, the "**Prepetition Loans**" and the collateral securing the Prepetition Loans, the "**Prepetition Collateral**");

WHEREAS, on July 1, 2024, the Borrower and Bender Equity LLC, a New Jersey limited liability company (the "**Junior Lender**"), entered into that certain Loan and Security Agreement (as amended, the "**Junior Prepetition Credit Agreement**"; the aggregate loans made pursuant thereto, the "**Junior Prepetition Loans**" and the collateral securing the Prepetition Loans, the "**Junior Prepetition Collateral**");

WHEREAS, on May 15, 2026, Junior Lender, Borrower and Senior Lender entered into that certain *Subordination Agreement* that provides, *inter alia*, for the subordination of all indebtedness and security interests of Junior Lender in favor of the prior lien, payment, and performance rights of Senior Lender with respect to the obligations of Borrower, pursuant to the terms therein.

WHEREAS, the Borrower has requested that the DIP Lender provide additional debtor-in-possession financing in the form of a second-position (second to Senior Lender) secured, super-priority revolving loan, pursuant to Section 364 of the Bankruptcy Code, which shall consist of a revolving loan in an aggregate maximum principal amount of up to $[●] (the "**Interim Amount**"), on an interim basis, and up to $810,000] (inclusive of the Interim Amount), on a final basis (the "**DIP Loan Maximum Amount**") (each advance thereunder, a "**DIP Loan**", and collectively, the "**DIP Loans**");

WHEREAS, the Borrower has also requested the continued use of cash collateral (as defined in Section 363(a) of the Bankruptcy Code) (the "**Cash Collateral**");

WHEREAS, the proceeds of the DIP Loan and the Cash Collateral will be used for working capital and other general corporate purposes of the Borrower to the extent permitted hereunder; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Borrower hereunder and under the other Loan Documents, the Borrower will provide to the DIP Lender the following (all as more fully described herein):

(i) pursuant to Section 364(c)(1) of the Bankruptcy Code, superpriority claim status in the Case;

(ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected second priority lien (junior only to the liens of the Senior Lender) on all unencumbered property and assets of the Borrower; and

(iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected second priority priming lien (the "**Priming Lien**"), junior only to the liens securing the Senior Lender's obligations under the

Prepetition Credit Agreement and any Senior Lender post-petition credit facility as approved by the Bankruptcy Court, on all assets of the Borrower, which Priming Lien shall prime all liens securing any prepetition debt obligations other than those securing the Senior Lender, and shall also be senior to any liens arising after the Petition Date to provide adequate protection (collectively, the "**Primed Liens**"), but shall not prime the Permitted Liens or the Senior Lender's liens;

NOW, THEREFORE, in consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE 1

### GENERAL INFORMATION

1.1 **DEFINED TERMS**. Capitalized terms in this Agreement have the meanings ascribed to them in Schedule 1.

## ARTICLE 2

### TERMS OF THE DIP LOAN

2.1 **THE DIP LOAN**.

(a) Subject to the terms and conditions hereof, the DIP Lender has made and may make, in its sole and absolute discretion, DIP Loans to the Borrower from time to time to fund operating costs and other items incurred by Borrower in accordance with and limited by the other terms herein and the Budget during the DIP Commitment Period in an aggregate principal amount at any one time outstanding which does not exceed the amount of the DIP Commitment. During the DIP Commitment Period, the Borrower may use the DIP Commitment by borrowing, prepaying and reborrowing the DIP Loans in whole or in part, all in accordance with the terms and conditions hereof. The DIP Commitment is an uncommitted facility, and each DIP Loan or other extension of credit issued hereunder shall be made at the sole and absolute discretion of the DIP Lender.

(b) The DIP Loan shall be evidenced by the Note, which has been executed on even date herewith.

(c) Interest shall accrue as set forth in the Note.

(d) The Borrower shall repay all outstanding DIP Loans as set forth in the Note.

2.2 **PROCEDURE FOR LOAN BORROWING**. The Borrower may borrow, in such amounts expressly set forth and permitted by the Budget, under the DIP Commitment during the DIP Commitment Period on any Business Day; provided that the Borrower shall give the DIP Lender notice (which must be received by the DIP Lender prior to 12:00 Noon, prevailing Eastern time, five (5) Business Days prior to the requested Borrowing Date) specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date.

## ARTICLE 3

### GENERAL PROVISIONS APPLICABLE TO LOANS; LIEN PRIORITY; FEES

3.1 **OPTIONAL PREPAYMENTS**. The Borrower may at any time and from time to time prepay the

Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the DIP Lender no later than 11:00 AM, prevailing Eastern time, one (1) Business Day prior thereto, which notice shall specify the date and amount of prepayment. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest as of such date on the amount prepaid.

3.2 **PRIORITY AND LIENS**.

(a) Superpriority Claims and Liens. The Borrower hereby covenants, represents and warrants that, from the date of the Interim DIP Order and upon entry of the Final Order, the Obligations authorized by the Interim Order and the Final Order of the Borrower under the Loan Documents: (i) pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute allowed administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections 503(b), 507(a) or 507(b) of the Bankruptcy Code, but junior to any superpriority claims granted to the Senior Lender; (ii) pursuant to Sections 361, 362 and 364(c)(2) of the Bankruptcy Code and the Security Agreement, shall be secured by, and the Borrower shall have granted to the DIP Lender a perfected second priority Lien (second only to the Senior Lender's liens) on the Collateral that is not and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code and the Security Agreement, shall be secured by, and the Borrower shall have granted to the DIP Lender a perfected second priority Priming Lien on the Collateral that is subject to the Junior Lender's liens and the Permitted Liens (other than the Senior Lender's Liens, which shall remain senior) and any Liens that are junior thereto, including any Liens granted on or after the Petition Date to provide adequate protection in respect of the prepetition debt obligations.

(b) Collateral Security Perfection. The Borrower agrees to take all action that the DIP Lender may reasonably request as a matter of non-bankruptcy law to perfect and protect the DIP Lender's Liens for the benefit of the DIP Lender, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the DIP Lender may reasonably request. The Borrower hereby irrevocably authorizes the DIP Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code ("**UCC**") jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of Michigan or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by Article 9 of the UCC of the State of Michigan or such other jurisdiction, as applicable, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Borrower is an organization, the type of organization and any organization identification number issued to such Borrower; and, (ii) in the case of financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the DIP Lender promptly upon request. Notwithstanding the provisions of this Section, the DIP Lender shall have the benefits of the Interim Order as set forth in Section 7.1(f) hereof and the Final Order as set forth in Section 7.2(c) hereof.

(c) Real Property. Subject in all respects to the priorities set forth in Section 3.2(a) above, the Borrower grants to the DIP Lender a security interest in, and mortgage on, all of the right, title

and interest of the Borrower in all real property owned or leased by the Borrower, together in each case with all of the right, title and interest of the Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Borrower shall acknowledge that, pursuant to the Interim Order and the Final Order, the Liens in favor of the DIP Lender in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the DIP Lender shall have the benefits of the Interim Order as set forth in Section 7.1(f) hereof and the Final Order as set forth in Section 7.2(c) hereof. The Borrower agrees that upon the reasonable request of the DIP Lender, the Borrower shall promptly enter into separate fee or leasehold mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the DIP Lender.

3.3 **FEES**. The Borrower agrees to pay the fees set forth in this Section 3.3. All such fees shall be deemed fully earned and non-refundable.

(a) The Borrower shall pay to the DIP Lender a commitment fee in the amount equal to Five percent (5%) of the DIP Loan Maximum Amount (the "**Commitment Fee**"). The Commitment Fee shall be deemed fully earned on the Closing Date and shall be due and payable pursuant to the Interim Order and the Final Order, respectively.

(b) The Borrower shall pay to the DIP Lender a monthly administration fee in an amount equal to $1,000 (the "**Administration Fee**") per month. The Administration Fee shall be payable monthly, commencing August 8, 2026, and on the same day of each month thereafter until the Obligations are paid in full.

(c) The Borrower shall pay to the DIP Lender, on DIP Lender's demand, all Expenses.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES

Borrower makes the following representations and warranties to DIP Lender as of the date of this Agreement:

4.1 **ORGANIZATION, POWER AND AUTHORITY OF BORROWER; LOAN DOCUMENTS**. Borrower (a) is duly organized, validly existing and in good standing under the laws of the state of Michigan, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as a lessee, and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign limited liability company and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, and (d) is in compliance with the terms of its governing documents and all Laws.

4.2 **OTHER DOCUMENTS; LAWS**. Upon entry of and by virtue of the Final Order, the execution and performance of the Loan Documents to which Borrower is a party and the consummation of the transactions contemplated thereby will not conflict with, result in any breach of, or constitute a default under, the governing documents of Borrower, or any contract, agreement, document or other instrument to which Borrower is a party or by which Borrower or any of its properties may be bound or affected, and such actions do not and will not violate or contravene any Law to which Borrower is subject.

4.3 **TAXES**. Borrower has filed all federal, state, county and municipal tax returns required to have been filed by Borrower as of the date hereof and Borrower has paid all taxes which have become due

pursuant to such returns or pursuant to any tax assessments received by Borrower, except as set forth in Borrower's bankruptcy schedules to be filed in the bankruptcy case.

4.4 **LEGAL ACTIONS**. There are no Claims or investigations by or before any court or Governmental Authority, pending, or to the best of Borrower's knowledge and belief, threatened against or affecting Borrower, or the business operations or assets of Borrower that have arisen after the date of Borrower's bankruptcy petition. Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority affecting Borrower or the Collateral after the date of Borrower's bankruptcy petition.

4.5 **NATURE OF LOAN**. Borrower is a business or commercial organization. The Loan is being obtained solely for business purposes, and will not be used for personal, family, or household purposes.

4.6 **FINANCIAL STATEMENTS**. The financial statements heretofore delivered by Borrower to DIP Lender are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fairly present the respective financial conditions of the subjects covered thereby as of the respective dates thereof.

4.7 **COMPLIANCE WITH LAWS AND OTHER REQUIREMENTS**. Borrower is in compliance with the requirements of all applicable Laws.

4.8 **NO DEFAULTS**. There is no Default or Event of Default under any of the Loan Documents.

4.9 **PERFECTION OF SECURITY INTEREST**. Upon entry of the Final Order, such order is effective to create in favor of DIP Lender, a valid and enforceable security interest in the Collateral and all proceeds thereof.

4.10 **SECURED SUPERPRIORITY CLAIMS**. On and after the Closing Date and the entry of the Final Order, such Final Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 3.2 of this Agreement. The Order is in full force and effect and has not been vacated, reversed, modified, amended, rescinded or stayed without prior written consent of the DIP Lender.

## ARTICLE 5

### AFFIRMATIVE COVENANTS AND AGREEMENTS

Borrower covenants as of the date hereof and until such time as all Obligations shall be paid and performed in full, that:

5.1 **FINANCIAL REPORTING**. The Borrower shall furnish, or cause to be furnished, copies of the following financial statements, reports, notices and information, each in form and content acceptable to DIP Lender in its sole discretion:

(a) as soon as available and in any event within thirty (30) days after the end of each month, a consolidated income statement of the Borrower;

(b) as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter, a copy of quarterly consolidated financial statements for such Fiscal Quarter, including therein a balance sheet and a statement of earnings and cash flow for the period commencing at the end of the previous year and ending with the end of such Fiscal Quarter;

(c) as soon as available and in any event within ninety (90) days after the end of each Fiscal Year, a copy of the annual consolidated financial statements for such Fiscal Year, including therein a balance sheet and a statement of earnings and cash flow for such Fiscal Year; and

(d) such additional information as reasonably requested from the DIP Lender from time to time in DIP Lender's reasonable discretion.

5.2 **BUDGET AND VARIANCE**. The Budget shall set forth all proposed expenditures by the Borrower and shall include various cash flow performance benchmarks to be agreed upon by the DIP Lender and the Debtor. The DIP Lender shall have the right to require, in its sole discretion, changes to the Budget from *inter alia* Borrower's performance and satisfaction of the Milestones prior to any advance. Every four weeks, the Borrower shall provide to the DIP Lender a variance report/reconciliation relating to the Budget for the preceding four-week period and cumulative 13-week period in form and substance satisfactory to the DIP Lender (the "**Variance Report**"). The Borrower shall provide proposed updates to the Budget at least once every four weeks, subject to approval of the DIP Lender, but in no event shall such updates result in an increase of the DIP Loan Maximum Amount. Prior to the repayment in full of the DIP Loan, all payments (inclusive of costs, expenses and fees) to be made by the Borrower shall be made pursuant to the Budget.

5.3 **COMPLIANCE WITH LAWS; USE OF PROCEEDS**. Borrower shall comply with all Laws and all orders, writs, injunctions, decrees and demands of any court or any Governmental Authority affecting Borrower. Borrower shall use all proceeds of the Loan to (a) make payments of interest, fees and costs as required by the Loan Documents, and (b) make payments consistent with the Budget, which Borrower acknowledges, are business purposes and are not in contravention of any Law.

5.4 **PAYMENT OF POST PETITION OBLIGATIONS**. Borrower shall pay, discharge or otherwise satisfy as the same become due or before they become delinquent, as the case may be, all its material obligations incurred on or after the Petition Date of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings.

5.5 **INSPECTIONS; COOPERATION**. Borrower shall, upon the reasonable request of DIP Lender, permit representatives of DIP Lender to inspect all records and books of account maintained by or on behalf of Borrower and to discuss the affairs, finances and accounts pertaining to the Loan with representatives of Borrower. Borrower shall at all times during the term of the Loan, use its best efforts to cooperate with the representatives of DIP Lender as necessary or appropriate in connection with or in aid of the performance of DIP Lender's functions under this Agreement. Except in the event of an emergency, DIP Lender shall give Borrower at least twenty-four (24) hours' notice by telephone in each instance before exercising any rights granted in this Section.

5.6 **PAYMENT AND PERFORMANCE OF CONTRACTUAL OBLIGATIONS**. Borrower shall perform in a timely manner all of their respective obligations under any and all material contracts and agreements arising after Borrower files its bankruptcy petition, and Borrower will pay when due all bills for services or labor performed after it files its bankruptcy petition.

5.7 **DIP LENDER'S RIGHTS TO PAY AND PERFORM**. If, after any required notice, Borrower fails to promptly pay or perform any of its post-petition contractual obligations under any contract or agreement within any applicable grace or cure periods, DIP Lender, without further Notice to or demand upon Borrower, and without waiving or releasing any Obligation or Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act on behalf, for the account and at the expense, of Borrower.

5.8 **REIMBURSEMENT; INTEREST**. If DIP Lender incurs any Expenses or pays any Claims by reason of the Loan or the rights and remedies provided under the Loan Documents (regardless of whether or not any of the Loan Documents expressly provide for an indemnification by Borrower against such Claims), DIP Lender's payment of such Expenses and Claims shall constitute advances to Borrower, subject to the DIP Loan Maximum Amount, which shall be paid by Borrower to DIP Lender on demand, together with interest thereon from the date incurred until paid in full at the Default Rate of interest then applicable to the Loan under the terms of the Note. Each advance shall be secured by the Security Agreement and the other Loan Documents as fully as if made to Borrower, regardless of the disposition thereof by the party or parties to whom such advance is made. Notwithstanding the foregoing, however, in any action or proceeding to recover or collect the Obligations, the provisions of Law governing the recovery of costs, disbursements and allowances shall prevail unaffected by this Section.

5.9 **INDEMNIFICATION BY BORROWER**. Borrower agrees to indemnify DIP Lender and to hold DIP Lender harmless from and against, any and all Claims to the extent directly or indirectly arising out of or resulting from any act or omission of Borrower in any way connected with the Loan, including, without limitation, any Default hereunder or under any of the other Loan Documents; or any assertion or allegation that DIP Lender is liable for any act or omission of Borrower. The agreements and indemnifications contained in this Section shall apply to Claims arising both before and after the repayment of the Loan and shall survive the repayment of the Loan, any foreclosure or deed, assignment or conveyance in lieu thereof and any other action by DIP Lender to enforce the rights and remedies of DIP Lender hereunder or under the other Loan Documents.

5.10 **REPRESENTATIONS AND WARRANTIES**. Borrower shall take all actions and shall do all things necessary or desirable to cause all of Borrower's representations and warranties in this Agreement to be true and correct at all times during the term of the Loan.

5.11 **MAINTENANCE OF EXISTENCE**. Borrower shall maintain and preserve its organizational existence and good standing and all rights, privileges, licenses, franchises and permits necessary to continue its business as currently conducted.

5.12 **MAINTENANCE OF RECORDS**. Borrower shall keep adequate records and books of account in which complete entries will be made in accordance with generally accepted accounting principles consistently applied reflecting all material financial transactions of Borrower.

5.13 **NOTICE OF DEFAULT**. Borrower shall promptly notify DIP Lender in writing as soon as any manager or member of Borrower acquires knowledge of any Event of Default or any default under the Loan Documents and the action Borrower proposes to take with respect thereto.

5.14 **CARVE-OUT**. The Carve-Out shall be reflected in, and be limited to, the Budget; and

(a) On the day on which a Carve-Out Trigger Notice is given to the Borrower, the Borrower shall fund a segregated account (the "**Post-Default Carve-Out Account")** in an aggregate amount equal to $35,000 plus the actual amount of incurred and unpaid fees and expenses of professionals incurred by the Debtor and any official committee appointed in the Case prior to the date of the delivery of the Carve-Out Trigger Notice, not in excess of the budgeted amount for such fees and expenses of professionals through such date (the "**Post-Default Carve-Out**").

(b) Amounts on deposit in the Post-Default Carve-Out Account shall be used to satisfy the fees and expenses of professionals incurred by the Debtor and any official committee appointed in

the Case arising under the Post-Default Carve-Out and the excess over the allowed fees and expenses of professionals up to their permitted Budgeted amount, if any, in the Post-Default Carve-Out Account shall pay the principal amount of the Loan.

(c) Nothing herein shall constitute a waiver by the Senior Lender or the DIP Lender of their rights to object to the fees and expenses of any professional retained by the Debtor or an official committee appointed in the Case, all such rights being specifically reserved.

(d) Notwithstanding the foregoing, the DIP Loan, all cash, cash collateral and Available Cash, the Carve-Out and the Post-Default Carve-Out (including any proceeds on deposit in the Post-Default Carve-Out Account) shall not be available for any fees or expenses incurred by any party, including the Debtor or any official committee appointed in the Case, or its or their professionals, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, contested matter, objection, other litigation or discovery against the DIP Lender, its advisors, agents or subagents, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the Obligations and the Liens and claims granted hereunder in favor of the DIP Lender.

5.15 **FURTHER ASSURANCES**. At DIP Lender's reasonable written request, Borrower shall promptly execute or cause to be executed and deliver to DIP Lender any and all documents, instruments and agreements necessary for DIP Lender to perfect or to continue perfection of DIP Lender's liens or security interests created by or pursuant to the Loan Documents, or to give effect to or to carry out the terms or intent of this Agreement or any of the other Loan Documents.

5.16 **BANK ACCOUNTS; CASH CONTROLS**. Subject to the Senior Lender’s requirements, the Borrower shall maintain all deposit, cash collection, general disbursement and other bank accounts in such banks as may be acceptable to the DIP Lender.

5.17 **MILESTONES**. The Borrower shall satisfy, in DIP Lender's sole discretion, the following milestones as set forth below (each individually, a "**Milestone**" and collectively, the "**Milestones**"):

(a) By July 17, 2026, the Borrower shall obtain approval of the Interim Order acceptable to DIP Lender by the Bankruptcy Court on a final, non-appealable basis;

(b) By August 14, 2026, the Borrower shall obtain Bankruptcy Court approval of the Final Order, on a final, non-appealable basis, acceptable to the DIP Lender;

(c) By January 31, 2027, the Borrower shall have confirmed a Chapter 11 Plan of Reorganization or closed the sale(s) of the Borrower’s assets pursuant to a sale approval order.

## ARTICLE 6

### NEGATIVE COVENANTS

Borrower covenants as of the date hereof and until such time as all Obligations shall be paid and performed in full, that Borrower shall not:

6.1 **COMMINGLING**. Commingle the funds and other assets of Borrower with those of any Affiliate or any other Person.

6.2 **ADDITIONAL DEBT**. Incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the Loan, (ii) advances made by Senior Lender pursuant to a debtor-in-possession loan approved by the Bankruptcy Court, (iii) obligations to professionals and the Office of the United States Trustee, and similar restructuring, legal or advisory fees and expenses, and (iv) ordinary course unsecured debt, which may include credit card obligations and trade debt.

6.3 **LIENS**. Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except for Permitted Liens, Liens of the Senior Lender and Junior Lender, prepetition taxes, assessments and governmental charges (provided that the enforcement and collection of the prepetition taxes, assessments and governmental charges are subject to the automatic stay in the Case).

6.4 **MODIFICATION OR AMENDMENT OF ORGANIZATIONAL DOCUMENTS**. Consent to, permit, or suffer to exist any amendment to or modification of the Operating Agreement, Articles of Organization or any other governing documents of Borrower.

6.5 **DISSOLUTION, ETC**. Dissolve, wind-up or liquidate, reorganize, merge or consolidate with or into or acquire all or substantially all of the assets or the business of any entity or enter into any agreement to do any of the foregoing.

6.6 **TRANSFERS; NEW MEMBERS**. Permit the transfer, purchase, or assignment of any membership interests of Borrower, or issue additional membership interests, or redeem any membership interests of Borrower.

6.7 **DISTRIBUTIONS**. Declare, permit or pay any distributions or dividends of any kind.

6.8 **USE OF PROCEEDS**. Amounts loaned or advanced under, or in connection with, the DIP Loan, any and all proceeds of collateral and all existing and future cash collateral may not be used, directly or indirectly, by any Debtor, or any other person or entity to: (a) object to, contest in any manner, or raise any defenses to, the validity, perfection, priority, extent, amount or enforceability of the DIP Loan, any Loan Document, any post-petition Obligation, any post-petition Lien or Superpriority Claim; (b) assert any claims or causes of action against the DIP Lender or its respective advisors, agents and sub-agents, including discovery in anticipation thereof, or in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation involving the DIP Lender; (c) prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on Collateral in accordance with the Loan Documents, or the Interim Order; (d) seek to modify any of the rights granted to the DIP Lender hereunder, under the Loan Documents without the DIP Lender's written consent; (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (1) approved by an Order of the Bankruptcy Court and (2) in accordance with the Budget; (f) seek authorization, or support any other person or entity seeking authorization, to use any Cash Collateral without the consent of the DIP Lender; or (g) obtain a lien senior to, or on a parity with, the liens of the DIP Lender in any Collateral or any portion thereof, except for a Lien in favor of the Senior Lender in connection with a post-petition loan facility approved by the Bankruptcy Court.

6.9 **BANKRUPTCY MATTERS**.

**(a)** Incur, create, assume, suffer to exist or permit a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind

specified in Sections 503(b), 506(c), or 507(b)) of the Bankruptcy Code equal or senior to the priority claim of the DIP Lender, excepting obligations in favor of the Senior Lender in connection with a post-petition loan facility approved by the Bankruptcy Court;

**(b)** Consent or suffer to exist any Lien on the Collateral having a priority equal or senior to the Liens in favor of the DIP Lender, except for (i) legal, valid and enforceable Permitted Liens and (ii) Liens on favor of the Senior Lender;

**(c)** Except with DIP Lender's consent, seek or consent to any modification, stay, vacation or amendment to (i) any Bankruptcy Court order if such action would have an adverse effect on the rights of the DIP Lender under this Agreement, (ii) the Interim Order or (iii) the Final Order; or

**(d)** Seek or consent to any plan of reorganization or liquidation unless all of the Obligations are to be paid in full in cash and the arrangements provided herein are terminated pursuant thereto prior to or contemporaneously with the effectiveness of such plan.

**(e)** Seek entry of an order approving a sale of substantially all of Borrower's assets unless all of the Obligations are to be paid in full in cash and the arrangements provided herein are terminated pursuant thereto prior to or contemporaneously with the consummation of such sale.

## ARTICLE 7

## CONDITIONS PRECEDENT

7.1 **CONDITIONS TO INITIAL EXTENSION OF CREDIT**.

**(a)** **LOAN DOCUMENTS**. The DIP Lender shall have received the Loan Documents executed and delivered by the Borrower as of the Closing Date.

**(b)** **RESERVED**.

**(c)** **DELIVERY OF BUDGET**. The Borrower shall have delivered an initial Budget to the DIP Lender, satisfactory in form and substance to the DIP Lender.

**(d)** **FEES**. All amounts required to be paid to the DIP Lender, including all fees set forth in Section 3.3, and all other Expenses, fees and costs payable in connection with the execution, delivery, recordation and filing of any documents and instruments in connection with the DIP Loan shall be approved in the Interim Order and paid on the Closing Date or as otherwise required.

**(e)** **VALIDITY OF LIENS**. The Security Agreement shall, upon entry of the Interim Order, be effective to create in favor of the DIP Lender, a legal, valid and enforceable second priority perfected security interest in and lien on the Collateral. All filings, recordings, deliveries of instruments and other actions necessary or desirable in the opinion of the DIP Lender to protect and preserve such security interest shall have been duly effected. The DIP Lender shall have received evidence thereof in form and substance satisfactory to the DIP Lender.

**(f)** **INTERIM ORDER**. The Bankruptcy Court shall have entered the Interim Order and such Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed. If such Interim Order is the subject of a pending appeal in any respect, none of such order, the initial extensions of credit, or the performance by DIP Lender of any of the Obligations shall be the subject of a presently effective stay pending appeal. The DIP Lender shall be entitled to rely in good faith upon such Interim Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrower and DIP Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

**(g)** **CLOSING DATE**. The closing date with respect to the Loan Documents and Obligations shall be the date this Agreement, is signed page 1 ("**Closing Date**"), and the Closing Date shall occur no later than July 17, 2026.

7.2 **CONDITIONS TO EACH EXTENSION OF CREDIT**. The agreement of the DIP Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit) is subject to the satisfaction of the following conditions precedent:

**(a)** **REPRESENTATIONS AND WARRANTIES**. Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent that such representations and warranties to an earlier date, in which case they shall be true and correct as of such earlier date.

**(b)** **NO DEFAULT**. No Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

**(c)** **FINAL ORDER**. Within thirty (30) days from the date of entry of the Interim Order, the Bankruptcy Court shall have entered the Final Order and such Final Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed. If such Final Order is the subject of a pending appeal in any respect, none of such order, the initial extensions of credit, or the performance by DIP Lender of any of the Obligations shall be the subject of a presently effective stay pending appeal. The DIP Lender shall be entitled to rely in good faith upon such Final Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrower and DIP Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 7.2 have been satisfied.

## ARTICLE 8

## EVENTS OF DEFAULT

The occurrence from time to time of any one or more of the following shall constitute an Event of Default under this Agreement:

8.1 **PAYMENT DEFAULT**. Borrower fails to pay the DIP Loan or other indebtedness owed under this Agreement or the other Loan Documents when due, whether on the scheduled due date or upon acceleration, maturity or otherwise.

8.2 **DEFAULT UNDER OTHER LOAN DOCUMENTS**. An Event of Default occurs under the Note or any Loan Document, or Borrower fails to promptly pay, perform, observe or comply with any term, obligation or agreement contained in any of the Loan Documents (within any applicable grace or cure period).

8.3 **ACCURACY OF INFORMATION; REPRESENTATIONS AND WARRANTIES**. Any information contained in any financial statement, schedule, report or any other document delivered by Borrower to DIP Lender in connection with the Loan proves at any time not to be in all material respects true and accurate, or Borrower fails to state any material fact or any fact necessary to make such information not misleading, or any representation or warranty contained in this Agreement or in any other Loan Document or other document, certificate or opinion delivered to DIP Lender in connection with the Loan, proves at any time to be incorrect or misleading in any material respect either on the date when made or on the date when reaffirmed pursuant to the terms of this Agreement.

8.4 **NON-PERFORMANCE OF CERTAIN COVENANTS**. Borrower fails to perform and comply with any of the Obligations and/or covenants set forth in Sections 5.2, 5.4, 5.6, 5.14, 5.16, and 5.17 herein.

8.5 **NON-PERFORMANCE OF OTHER COVENANTS**. Borrower fails to promptly perform or comply with any of the Obligations, terms, conditions and/or covenants set forth in this Agreement (other than those expressly described in other Sections of this Article 8) or the other Loan Documents, and such failure continues uncured for a period of five (5) Business Days after Notice from DIP Lender to Borrower.

8.6 **IMPROPER USE OF PROCEEDS**. The use of proceeds from the DIP Loan in any manner inconsistent with the DIP Loan Documents or the Interim Order or Final Order.

8.7 **DISSOLUTION; CHANGE IN BUSINESS STATUS**. All or substantially all of the business assets of Borrower are sold, Borrower is dissolved, or there occurs any change in the form of business entity through which Borrower presently conducts its business or any merger or consolidation involving Borrower.

8.8 **BUDGET EVENT**. The actual amount of the calculation of net Cash Receipts and Cash Disbursements (as labeled in the Budget) has a total negative variance from the amount set forth in the Budget by fifteen percent (15%) or more for any given four-week period on a non-cumulative basis.

8.9 **MILESTONE DEFAULT**. Borrower fails to meet any Milestone set forth in Section 5.18 by the date specified therein.

8.10 **SECURITY**. The invalidity of any post-petition lien or security document in favor of the DIP Lender, or the grant of a Priming Lien to any party other than DIP Lender or the Senior Lender that does not result in the payment in full and satisfaction of the Obligations.

8.11 **DISMISSAL OR CONVERSION; CLAIMS**. (i) The Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the

dismissal of the case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business under section 1106(b) of the Bankruptcy Code is appointed in the Case; (ii) an application is filed by the Borrower for the approval of any Superpriority Claim in the Case which is pari passu with or senior to the claim of the DIP Lender against Borrower (other than any superpriority claim of the Senior Lender), or there is granted any such pari passu or senior Superpriority Claim (other than to the Senior Lender); (iii) the Bankruptcy Court enters an order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Final Order (after entry thereof) or any other order with respect to the Case affecting in any material respect this Agreement or the other Loan Documents, without the DIP Lender's consent; (iv) the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest (other than the DIP Lender or the Senior Lender) to permit foreclosure on any Collateral of the Borrower; (v) the Bankruptcy Court enters an order approving the sale, transfer, lease, exchange, alienation or other disposition of all or substantially all of the assets and properties of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise (except any such sale, transfer, lease, exchange, alienation or other disposition permitted by this Agreement), without the consent of the DIP Lender; (vi) any failure to approve a Section 506(c) waiver and a waiver of the "equities of the case" exception in Section 552(b) in the Final Order; and (vii) the grant of a priming lien pursuant to Section 364(d) to any party other than DIP Lender or the Senior Lender that does not result in payment in full of the DIP Loan.

## ARTICLE 9

### REMEDIES ON DEFAULT

9.1 **REMEDIES ON DEFAULT**. Upon the occurrence of an Event of Default, DIP Lender shall have the right, in addition to any other rights or remedies available to DIP Lender under the Loan Documents or under applicable Law, to exercise any one or more of the following rights and remedies:

(a) Automatically, without further order or application to the Bankruptcy Court, terminate the DIP Commitment.

(b) Accelerate all of Borrower's Obligations under the Loan Documents whereupon such Obligations shall become immediately due and payable, without notice of default, acceleration or intention to accelerate, presentment or demand for payment, protest or notice of nonpayment or dishonor, or notices or demands of any kind or character (all of which are hereby waived by Borrower).

9.2 **NO RELEASE OR WAIVER; REMEDIES CUMULATIVE AND CONCURRENT**. Borrower shall not be relieved of any Obligation by reason of the failure of DIP Lender to comply with any request of Borrower or of any other Person to take action to enforce any provision of the Loan Documents, or by reason of the release, regardless of consideration, of all or any part of the Collateral. No delay or omission of DIP Lender to exercise any right, power or remedy accruing upon the happening of an Event of Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Event of Default or any acquiescence therein. No delay or omission on the part of DIP Lender to exercise any option for acceleration of the maturity of the Obligations following any Event of Default as aforesaid, or any other option granted to DIP Lender hereunder in any one or more instances, or the acceptance by DIP Lender of any partial payment on account of the Obligations shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect. No remedy herein conferred upon or reserved to DIP Lender is intended to be exclusive of any other remedies provided for in the Loan Documents, and each and every such remedy

shall be cumulative, and shall be in addition to every other remedy given hereunder, or under the Loan Documents, or now or hereafter existing at Law or in equity or by statute. Every right, power and remedy given by the Loan Documents to DIP Lender shall be concurrent and may be pursued separately, successively or together against Borrower or the Collateral or any part thereof, and every right, power and remedy given by the Loan Documents may be exercised from time to time as often as may be deemed expedient by DIP Lender.

## ARTICLE 10

## MISCELLANEOUS

10.1 **FURTHER ASSURANCES; AUTHORIZATION TO FILE DOCUMENTS**. At any time, and from time to time, upon request by DIP Lender, Borrower will, at Borrower's expense, (a) correct any defect, error or omission which may be discovered in the form or content of any of the Loan Documents, and (b) make, execute, deliver and record, or cause to be made, executed, delivered and recorded, any and all further instruments, certificates and other documents as may, in the opinion of DIP Lender, be necessary or desirable in order to complete, perfect or continue and preserve the lien rights and security interest. Upon any failure by Borrower to do so, DIP Lender may make, execute and record any and all such instruments, certificates and other documents for and in the name of Borrower, all at the sole expense of Borrower, and Borrower hereby appoints DIP Lender the agent and attorney-in-fact of Borrower to do so, this appointment being coupled with an interest and being irrevocable. Without limitation of the foregoing, Borrower irrevocably authorizes DIP Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements deemed necessary or desirable by DIP Lender, in its reasonable discretion, to establish or maintain the validity, perfection and priority of the security interests granted in the Security Agreement. In addition, at any time, and from time to time, upon the reasonable request of DIP Lender, Borrower will provide any and all further instruments, certificates and other documents as may, in the reasonable discretion of DIP Lender, be necessary or desirable in order to verify Borrower's identity and background in a manner reasonably satisfactory to DIP Lender.

10.2 **NO PARTNERSHIP**. Nothing contained in this Agreement shall be construed in a manner to create any relationship between Borrower and DIP Lender other than the relationship of borrower and DIP Lender and Borrower and DIP Lender shall not be considered partners or co-venturers for any purpose on account of this Agreement.

10.3 **SEVERABILITY**. In the event any one or more of the provisions of this Agreement or any of the other Loan Documents shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any other respect, or in the event any one or more of the provisions of any of the Loan Documents operates or would prospectively operate to invalidate this Agreement or any of the other Loan Documents, then and in either of those events, at the option of DIP Lender, such provision or provisions only shall be deemed null and void and shall not affect the validity of the remaining Obligations, and the remaining provisions of the Loan Documents shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

10.4 **NOTICES**. All Notices required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed) or by facsimile. Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case

of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile, upon receipt; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Agreement or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason.

The address of Borrower is:

Phoenix Press, LLC
1775 Bellingham
Troy, Michigan 48083
Attention: Kirk Vercnocke

With a copy to:

Heilman Law PLLC
40900 Woodward Ave., Suite 100
Bloomfield Hills, MI 48304

The address of DIP Lender is:

PI DIP, LLC
38156 Saint Mary Street,
Clinton Township, Michigan 48036
Attention: Geoff Vercnocke

With a copy to:

Varnum LLP
480 Pierce Street, Suite 300
Birmingham, Michigan 48009
Attention: Brendan G. Best

10.5 **PERMITTED SUCCESSORS AND ASSIGNS**. Each and every one of the covenants, terms, provisions and conditions of this Agreement and the Loan Documents shall apply to, bind and inure to the benefit of Borrower, its successors and those assigns of Borrower consented to in writing by DIP Lender, and shall apply to, bind and inure to the benefit of DIP Lender and the endorsees, transferees, successors and assigns of DIP Lender, and all Persons claiming under or through any of them.

10.6 **MODIFICATION; WAIVER**. None of the terms or provisions of this Agreement may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against whom enforcement of the change, waiver, modification, discharge or termination is asserted. None of the terms or provisions of this Agreement shall be deemed to have been abrogated or waived by reason of any failure or failures to enforce the same.

10.7 **GOVERNING LAW**. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the laws of the state of Michigan.

10.8 **ENTIRE AGREEMENT**. The Loan Documents constitute the entire understanding and agreement between Borrower and DIP Lender with respect to the transactions arising in connection with the Loan, and supersede all prior written or oral understandings and agreements between Borrower and DIP Lender with respect to the matters addressed in the Loan Documents. In particular, and without limitation, the terms of any commitment by DIP Lender to make the Loan are merged into the Loan Documents. Except as incorporated in writing into the Loan Documents, there are no representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents. If there is any conflict between the terms, conditions and provisions of this Agreement and those of any other instrument or agreement, including any other Loan Document, the terms, conditions and provisions of this Agreement shall prevail.

10.9 **DOCUMENT EXPENSES**. Notwithstanding anything to the contrary herein, the parties agree that Borrower shall bear the Expenses for the negotiation and execution of the Loan Documents.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, Borrower and DIP Lender have caused this Agreement to be executed under seal as of the date first above written.

**BORROWER:**

PHOENIX PRESS, LLC,
a Michigan limited liability company, debtor in possession

By:_________________________________
Kirk Vercnocke
Its: Authorized Representative

**DIP LENDER:**

PI DIP, LLC,
a Michigan limited liability company

By:_________________________________
Geoffrey Vercnocke
Its: Authorized Representative

## Schedule 1
## Definitions

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" is as defined in the recitals hereto.

"Available Cash" means all of the Borrower's cash that constitutes the Prepetition Lenders' cash collateral (as defined in Bankruptcy Code Section 363(a)) in which the Prepetition Lenders have a security interest and any other cash and cash collateral.

"Average DIP Loan Usage" means, with respect to any period, the sum of the aggregate amount of DIP Loan Usage for each day in such period (calculated as of the end of each respective day) divided by the number of days in such period.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan.

"Borrower" is as defined in the recitals hereto.

"Borrowing Date" means any Business Day specified by the Borrower as a date on which the Borrower requests the DIP Lender to make a Loan hereunder.

"Budget" means a budget in the form of Exhibit A attached hereto and prepared on a rolling thirteen (13) week basis, which sets forth all of the Borrower's expenditures and cash flow, with such initial Budget covering the period from the Petition Date to and including the date that ends on the last day of the thirteenth (13th) week thereafter, and deliverable to the DIP Lender at the end of each thirteen (13) week period with monthly updates to DIP Lender on the first (1st) day of each month.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in the United States are authorized or required to close.

"Carve-Out" means the (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. Section 1930(a) of the Bankruptcy Code; (ii) the reasonable fees and expenses of professional Persons retained by the Debtor and any official committee appointed in the Case prior to delivery of a Carve-Out Trigger Notice, in each case, as reflected in the Budget.

"Carve-Out Trigger Notice" means a notice delivered by the DIP Lender to the Borrower following the occurrence of an Event of Default, expressly stating that the Post-Default Carve-Out has been invoked and referencing the relevant default provision under Article 9 of the UCC.

"Case" means the bankruptcy case number [●] commenced by the Borrower under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on the Petition Date.

"Cash Collateral" is as defined in the recitals hereto.

"Claim" means any liability, suit, action, claim, demand, loss, expense, penalty, fine, judgment or other cost of any kind or nature whatsoever resulting from or related the foregoing, including fees, costs and expenses of attorneys, consultants, contractors and experts.

"Collateral" means all property of the Borrower, now owned or hereafter acquired upon which a Lien is purported to be created by the Security Agreement and/or Final Order.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, "Controlling" or "Controlled" have meanings correlative thereto.

"Default" means an event or circumstance that, with the giving of Notice or lapse of time, or both, would constitute an Event of Default under the provisions of this Agreement.

"DIP Commitment" means the obligation of the DIP Lender, at DIP Lender's sole discretion, to make the DIP Loans up to the DIP Loan Maximum Amount.

"DIP Commitment Period" means the period from and including the Closing Date to the DIP Termination Date.

"DIP Lender" is as defined in the recitals hereto.

"DIP Loan" is as defined in the recitals hereto.

"DIP Loan Maximum Amount" is as defined in the recitals hereto.

"DIP Loan Usage" means, as of any date of determination, the sum of the amount of outstanding DIP Loans.

"DIP Termination Date" means the earlier of (i) the effective date of a confirmed Chapter 11 Plan of Reorganization, (ii) the closing of the sale of substantially all of the assets of the Borrower authorized and approved by the Bankruptcy Court, (iii) January 31, 2027, or (iv) the date of the acceleration of the Loan and the termination of the Loan as provided herein.

"Event of Default" means any event or circumstance specified in Article 8 and the continuance of such event or circumstance beyond the applicable grace and/or cure periods therefor, if any, set forth in Article 8.

"Expenses" means all fees, charges, costs and expenses of any nature whatsoever incurred at any time and from time to time (whether before or after an Event of Default) by DIP Lender in making, funding, administering or modifying the Loan, in negotiating or entering into any "workout" of the Loan, or in exercising or enforcing any rights, powers and remedies provided in the Security Agreement or any of the other Loan Documents, including attorneys' fees, court costs, receiver's fees, management fees and costs incurred in the repair, maintenance and operation of, or taking possession of, or selling, the Collateral.

"Final Order" means the final order entered by the Bankruptcy Court in substantially the form of Exhibit B approving the Loan Documents and granting the Superpriority Claim status and the Priming Lien and other Liens described in Section 3.2 hereof and provided for in the Security Agreement, which Final Order (i) has been entered, upon an application or motion of the Borrower reasonably satisfactory in form and substance to the DIP Lender, on such prior notice to such parties as may be required under the Bankruptcy Code and /or the Bankruptcy Court; (ii) authorizes extensions of credit in amounts equal to the DIP Commitment; (iii) is in full force and effect; (iv) approves the priority of the Liens and Superpriority Claims granted pursuant to Sections 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code and (v) provides that the DIP Lender is extending credit to the Borrower in good faith as that term is used in Section 364(e) of the Bankruptcy Code and waiving the provisions of Section 506(c) of the Bankruptcy Code.

"Fiscal Quarter" means a calendar quarter ending of the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31.

"Governmental Authority" means any governmental or quasi-governmental entity, including any court, department, commission, board, bureau, agency, administration, service, district or other instrumentality of any governmental entity.

"Interim Amount" is as defined in the recitals hereto.

"Interim Order" means the Final Order entered by the Bankruptcy Court, as modified, on an interim basis, and shall be deemed to incorporate the Prior Interim Orders.

"Laws" means all federal, state and local laws, statutes, rules, ordinances, regulations, codes, licenses, authorizations, decisions, injunctions, interpretations, orders or decrees of any court or other Governmental Authority having jurisdiction as may be in effect from time to time.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan" or "Loans" means any loan from DIP Lender to Borrower up to the DIP Loan Maximum Amount, the repayment obligations therewith being evidenced by the Note.

"Loan Documents" means this Agreement, the Note, the Security Agreement, the Guaranty and any and all other documents which Borrower or any other party or parties have executed and delivered, or may hereafter execute and deliver, to evidence, secure or guarantee the Obligations, or any part thereof, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Milestone" and "Milestones" are as defined in Section 5.18.

"Monthly Variance Report" is as defined in Section 5.2.

"Note" means the Promissory Note of even date herewith, in an amount equal to the DIP Loan Maximum Amount, made by Borrower to the order of DIP Lender, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified by DIP Lender and Borrower.

"Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of 10.4 of this Agreement.

"Obligations" means all present and future debts, obligations and liabilities of Borrower to DIP Lender arising pursuant to, or on account of, the provisions of this Agreement, the Note or any of the other Loan Documents, including the obligations: (a) to pay all principal, interest, late charges, prepayment premiums (if any) and other amounts due at any time under the Note; (b) to pay all Expenses, indemnification payments, fees and other amounts due at any time under any of the other Loan Documents, together with interest thereon as provided in such Loan Document; (c) to pay and perform all obligations of Borrower (or its Affiliate); and (d) to perform, observe and comply with all of the terms, covenants and conditions, expressed or implied, which Borrower is required to perform, observe or comply with pursuant to the terms of this Agreement or any of the other Loan Documents.

"Person" means an individual, a corporation, a partnership, a joint venture, a limited liability company, a trust, an unincorporated association, any Governmental Authority or any other entity.

"Permitted Liens" means (a) the liens of Navitas Credit Corp. in certain personal property described in UCC Financing Statement No. 20180807000862-0 filed on August 7, 2018 with the Michigan Secretary of State; (b) the liens of Engs Commercial Finance Co. in certain personal property described in UCC Financing Statement No. 20200505000665-9 filed on May 5, 2020 with the Michigan Secretary of State; (c) the liens of Engs Commercial Finance Co. in certain personal property described in UCC Financing Statement No. 20210322000234-1 filed on March 22, 2021 with the Michigan Secretary of State; (d) the liens of Canon Financial Services, Inc. in certain personal property described in UCC Financing Statement No. 20210925000065-4 filed on September 25, 2021 with the Michigan Secretary of State; (e) the liens of Canon Solutions America, Inc. in certain personal property described in UCC Financing Statement No. 20230428000978-9 filed on April 28, 2023 with the Michigan Secretary of State; (f) the liens of Canon Solutions America, Inc. in certain personal property described in UCC Financing Statement No. 20230428000979-8 filed on April 28, 2023 with the Michigan Secretary of State; (g) the liens of OnPoint Capital, LLC in certain personal property described in UCC Financing Statement No. 20230306000847-9 filed on March 6, 2023 with the Michigan Secretary of State; (h) the liens of Raymond Leasing Corporation in certain personal property described in UCC Financing Statement No. 20241119000406-8 filed on November 19, 2024 with the Michigan Secretary of State; and (i) the liens of Star Hill Financial LLC in certain personal property described in UCC Financing Statement No. 20250424000022048-1 filed on April 24, 2025 with the Michigan Secretary of State.

"Petition Date" is as defined in the recitals hereto.

"Post-Default Carve-Out" is as defined in Section 5.14(a).

"Post-Default Carve-Out Account" is as defined in Section 5.14(a).

"Prepetition Collateral" is as defined in the recitals hereto.

"Prepetition Credit Agreement" is as defined in the recitals hereto.

"Prepetition Loans" is as defined in the recitals hereto.

"Primed Liens" is as defined in the recitals hereto.

"Priming Lien" and "Priming Liens" are as defined in the recitals hereto.

"Security Agreement" means the Security Agreement from Borrower to DIP Lender dated on even date herewith, pursuant to which Borrower grants to DIP Lender a security interest in and to all assets of Borrower, for the purpose of securing the obligations.

"Superpriority Claim" means a claim against the Borrower which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Bi-Weekly Variance Report" is as defined in Section 5.2.

# EXHIBIT 6.C

*DIP Promissory Note*

**PROMISSORY NOTE**

$810,000.00 July __, 2026

FOR VALUE RECEIVED, PHOENIX PRESS, LLC, a Michigan limited liability company, as a debtor in possession ("**Borrower**" or "**Debtor**") hereby promises to pay PI DIP, LLC, a Michigan limited liability company (as "**Lender**"), on the DIP Termination Date, the principal amount of Eight hundred and ten thousand and 00/100 Dollars ($810,000.00) or, if less, the aggregate unpaid principal amount of all advances made by Lender to the Borrower under the DIP Loans pursuant to the Credit Agreement (as defined below), together with interest on the unpaid principal until paid at the rates per annum set forth below.

**1. The Credit Agreement**

This Promissory Note (this "**Note**") is the promissory note described in that certain Superpriority Secured Debtor-In-Possession Credit Agreement of even date herewith between the Lender and the Borrower (as amended, restated, or otherwise superseded from time to time, the "**Credit Agreement**"), the terms and conditions of which are incorporated herein by reference. Capitalized terms used but not otherwise defined in this Note shall have the meanings given them in the Credit Agreement. This Note is issued pursuant to, entitled to the benefit of, and secured by the liens and security interests described in, the Credit Agreement and the other Loan Documents, but the foregoing reference to the Credit Agreement and the other Loan Documents shall not affect or impair the absolute and unconditional obligation of the Borrower to pay all amounts evidenced by this Note in accordance with its terms.

**2. Interest**

Amounts outstanding under this Note will bear interest at a variable per annum rate equal to the sum of eleven and one-half percent (11.5%) (the "**Interest Rate**").

**3. Payments**

The Borrower shall pay all accrued interest on the outstanding principal balance of the DIP Loan on the first (1st) Business Day of each calendar month, commencing on the first (1st) Business Day of the first full calendar month following the date of this Note and continuing on the first (1st) Business Day of each calendar month thereafter until the DIP Termination Date, at which time all remaining accrued and unpaid interest shall be due and payable. On the DIP Termination Date, the Borrower shall repay all Obligations then outstanding with respect to the DIP Loan, including, without limitation, the outstanding principal balance of this Note, all interest accrued thereon, prepayment fees, charges and premiums, and all costs and expenses payable to the Lender.

The Borrower may prepay this Note in whole or in part at any time, without premium or additional charge, except as set forth in this Note, except that while obligations to the Senior Lender remain outstanding, prepayments may be made on this Note only with the written consent of the Senior Lender. Amounts so prepaid may be borrowed and reborrowed by the Borrower under this Note from time to time as provided in the Credit Agreement.

**4. Interest Computations**

Interest due with respect to this Note shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed. If the due date for any payment required under this Note is extended by operation of law, interest shall be payable for such extended time. If any payment required under this

Note is due on a day that is not a Business Day, such payment may be made on the next succeeding Business Day (with interest continuing to accrue until paid), unless such extension would carry such date for payment into the next calendar month, in which event such payment shall be made on the preceding Business Day.

## 5. Events of Default; Acceleration; Default Interest and Late Charges

The occurrence of an Event of Default under and as defined in the Credit Agreement shall be deemed an "**Event of Default**" hereunder. Upon the occurrence of an Event of Default, the Lender may declare the aggregate unpaid balance of principal of this Note, plus all accrued interest and all other unpaid Obligations, to be immediately due and payable. Upon the occurrence and during the continuance of any Event of Default, the outstanding principal balance of this Note shall bear interest at a rate per annum equal to two percent (2%) above the Interest Rate then in effect (the "**Default Rate**").

## 6. Application of Payments

Any payments received by the Lender with respect to this Note prior to the occurrence of an Event of Default shall be applied first to any costs, expenses, fees or prepayment premiums due to the Lender, second to any accrued interest, and third to the unpaid principal. Any payments received after the occurrence of an Event of Default shall be applied to the Obligations in such a manner as the Lender shall determine.

## 7. Place for Payments

All payments under this Note shall be made at the office of the Lender at the address set forth on the signature page of this Note (or at such other place as the Lender may designate from time to time in writing) in lawful money of the United States of America in federal or other immediately available funds.

## 8. Waivers by the Borrower

The Borrower waives presentment, demand, notice of dishonor, protest and all other demands and notices (except as provided in or required by the Credit Agreement) in connection with the delivery, acceptance, performance and enforcement of this Note. The Borrower's liability under this Note shall remain unimpaired notwithstanding (i) any extension of the time for payment or other indulgence granted by the Lender, (ii) the release of all or any part of the security granted to the Lender, or the liability (or release of liability) of any party that may assume or otherwise be liable for payment of the indebtedness evidenced by this Note or (iii) the performance of the Obligations of the Borrower under any of the other Loan Documents.

## 9. Business Purposes

The Borrower represents to the Lender that the proceeds of this Note will be used solely for business purposes and shall not be used for personal, family, or household purposes.

## 10. Usury

In no event shall the rate of interest on this Note exceed the maximum rate permitted by applicable law.

## 11. Note as Loan Document

This Note constitutes a Loan Document as defined in the Credit Agreement, the terms of which are incorporated herein by reference, including without limitation, the provisions pertaining to interest limitations, setoff, governing law, and jurisdiction and forum.

## 12. WAIVER OF JURY TRIAL, SERVICE OF PROCESS AND DAMAGES

**THE BORROWER AND, BY ITS ACCEPTANCE OF THIS NOTE, THE LENDER EACH KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS NOTE OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE BORROWER OR THE LENDER, INCLUDING, WITHOUT LIMITATION, THE LENDER'S ADMINISTRATION OF THE DIP LOAN OR ENFORCEMENT OF THIS NOTE OR THE OTHER LOAN DOCUMENTS. THE BORROWER AGREES IT SHALL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY CANNOT BE WAIVED OR HAS NOT BEEN WAIVED.**

**IN ANY ACTION OR PROCEEDINGS ARISING OUT OF, OR RELATING TO, THIS NOTE, THE BORROWER ABSOLUTELY AND IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT, DECLARATION, OR OTHER PROCESS AND ABSOLUTELY AND IRREVOCABLY AGREES THAT SERVICE OF PROCESS MAY BE MADE IN THE MANNER (AND TO THE ADDRESS FOR NOTICES TO THE BORROWER) SPECIFIED IN THE CREDIT AGREEMENT.**

**EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.**

**THE BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND AGREEMENTS, EACH OF WHICH CONSTITUTES A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS NOTE AND TO MAKE THE DIP LOAN.**

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first above written.

**BORROWER:**

PHOENIX PRESS, LLC

By:________________________________________
Kirk Vercnocke
Its: Authorized Representative

Address for Payments:

38156 Saint Mary Street,
Clinton Township, MI 48036